937 So.2d 404 (2006)
William C. OVERTON, Jr.
v.
SHELL OIL COMPANY, (a/k/a Shell Offshore, Inc.), Floyd Landry, and Dennis A. Pilney.
No. 2005-CA-1001.
Court of Appeal of Louisiana, Fourth Circuit.
July 19, 2006.
*406 James L. Arruebarrena, James L. Arruebarrena, LLC, New Orleans, LA, and Fred L. Herman, Law offices of Fred L. Herman, New Orleans, LA, for William C. Overton.
Kathleen F. Hobson, New Orleans, LA, and Marie Breaux, New Orleans, LA, for Shell Oil Company.
*407 (Court composed of Judge JAMES F. McKAY, III, Judge TERRI F. LOVE, Judge LEON A. CANNIZZARO, JR.).
TERRI F. LOVE, Judge.
This appeal arises under the Louisiana Environmental Whistleblower Statute regarding Shell Oil Company's termination of William Overton, who claimed his termination was retaliation based on his status as a whistleblower. The trial court held that William Overton was a whistleblower and awarded him damages of $609,586.20. The damage award included trebling all damages as well as interest and prejudgment interest. Shell Oil Company appeals asserting the trial court erred by finding William Overton was a whistleblower in good faith and by trebling damages outside the scope of Louisiana's whistleblower statute. We find the trial court did not err in determining William Overton was a good faith whistleblower and affirm the damage awards. We reverse the granting of prejudgment interest on the trebled portion of damages and the trebling of prejudgment and post-judgment interest.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
William Overton ("Mr. Overton") began working on offshore oil platforms for Shell Oil Company ("Shell") in 1984. Mr. Overton possessed a good personnel record and no disciplinary actions with Shell until 1997.

Eugene Island 189B
In 1997, Mr. Overton worked on the Eugene Island 189B ("EI189B") production platform, with Dennis Pilney ("Mr. Pilney") as his foreman and Floyd Landry ("Mr. Landry") as Superintendent, and was in charge of adjusting the pressure on the pilots on the platform. Jacket 20, one of the pilots, was not functioning properly and Mr. Overton adjusted the pressure to around 800 pounds per square inch ("psi") and completed documents for the Minerals Management Service ("MMS")[1] report. Following the completion of his hitch, the time spent offshore on the oil rig, Mr. Overton left for vacation. Upon his return to EI189B, Mr. Overton discovered that MMS boarded the platform to perform an inspection. MMS found federal infractions during the annual inspection. The MMS report for Jacket 20 indicated that it was in perfect working order. However, the pressure settings were incorrect at a setting of 1,200 psi. During the course of Shell's investigation, it discovered that a contract worker falsified the MMS report after Mr. Overton left EI189B. Crew members witnessed this contract worker discard Mr. Overton's report into the trash. The contract worker admitted to falsifying the MMS report, but blamed the incorrect pressure settings on Mr. Overton. Mr. Overton denied that he had adjusted Jacket 20 illegally to dangerous pressure settings as he had not had access to Jacket 20 since his departure weeks before. However, his report was discarded by the contract worker. This resulted in Mr. Overton receiving a one week suspension without pay for a safety violation.

Original Federal Complaint
On May 6, 1998, Mr. Overton filed a complaint in the United States District Court for the Eastern District of Louisiana ("EDLA"), 98-1361, against Shell regarding its violations of environmental laws and regulations during the 1997 EI189B incident. Specifically, Mr. Overton alleged the contract worker falsified *408 the MMS report, that the Shell manager had knowledge of the falsification and did not report it to the Department of the Interior or MMS, and that other Shell employees covered up the falsification. Shell received service of this complaint. The EDLA dismissed the complaint for lack of jurisdiction.

Bay Marchand 26
In 1998, Shell transferred Mr. Overton to Bay Marchand 26 ("BM26") under the supervision of Earl Callais ("Mr. Callais"). In October 1998, while on BM26, Mr. Overton used a substance called torque-seal[2] to make sure that no one changed his settings on safety valves. Mr. Callais was unhappy about the use of torque-seal and counseled Mr. Overton not to use it again. Due to his use of torque-seal, Mr. Overton received a Performance Evaluation of "Does Not Consistently Meet Expectations," his lowest evaluation since he began working for Shell.

Original State Petition
On June 9, 1999, Mr. Overton filed a petition in Civil District Court against Shell, Mr. Pilney, and Mr. Landry, which contained similar allegations to the federal complaint from 1998. Mr. Overton alleged that Shell covered up the MMS report falsification in violation of Federal laws. Mr. Overton also alleged Shell continued to retaliate against him, causing stress, damage to his reputation, and a transfer requiring him to drive over four hours from his home. The EDLA denied Shell's request for removal.

Main Pass 310
In July 1999, Shell transferred Mr. Overton to Main Pass 310 ("MP310") and Main Pass 252 ("MP252"). Chuck Holcomb ("Mr. Holcomb") was Mr. Overton's Field Supervisor and Christine Sistrunk ("Ms. Sistrunk") was Mr. Holcomb's Area Team Leader. On July 7, 1999, Mr. Overton arrived on MP310 and met with Mr. Holcomb who instructed him to meet with Sostane Tauriac ("Mr. Tauriac") for further instructions. Mr. Tauriac instructed Mr. Overton to keep a bucket full of soap that was injected into a water line from a WEMCO[3] unit on the platform. The soap acted as a surfactant, which increases the weight of the oil being discharged from the WEMCO and causes it to sink from the surface of the water. This removes the oil sheen from the water's surface. Mr. Overton was unsure if this was legal and advised Mr. Tauriac to shut down the WEMCO pending further advice. Mr. Tauriac instructed Mr. Overton that his only job was to make sure the bucket remained full of soap.
The same day, Mr. Overton called David Tregre ("Mr. Tregre"), a Department of Interior investigator, to report the possible safety violation. Mr. Tregre instructed Mr. Overton to continue injecting the soap and to take notes on everything. Later that day, Mr. Tauriac instructed Mr. Overton to disconnect the soap line. Mr. Tauriac informed Mr. Holcomb of the soap discharge, which he claimed was due to the lack of another chemical clarifier. Mr. Tauriac then filed a 201 form.[4]
*409 Following Shell's investigation, conducted by Ms. Sistrunk and Human Resources Representative Shanna Chalk Broussard ("Ms. Broussard"), into the soaping incident, Mr. Tauriac and Mr. Overton received 84 hour suspensions without pay. Both Mr. Tauriac and Mr. Overton had to complete a recommended Corrective Action Plan involving recertification and training at Shell's training facility in Robert, Louisiana. Mr. Overton's suspension was based on the fact that he did not report the possible violation to anyone at Shell, which allegedly violated Shell's Code of Conduct.

Federal Subpoenas Regarding Alleged Violations
On December 22, 1999, Mr. Overton formally announced to Ms. Sistrunk that he was working with the Department of Interior and of his status as a whistleblower. On January 19, 2000, while Mr. Overton was working on MP252, federal agents boarded the platform armed with weapons and issued grand jury subpoenas based upon alleged violations of environmental regulations. Several hours after the agents arrived, Ms. Sistrunk and Mr. Holcomb met with Mr. Overton to discuss his annual Performance Evaluation. Mr. Overton was given a "Marginal" rating on his evaluation. He was also given a Final Written Warning, a Personal Development Plan, and a Corrective Action Plan requiring many hours of training at the Robert training facility. Following the meeting, Ms. Sistrunk and Mr. Holcomb instructed Mr. Overton not to speak to other crew members and ordered him to remain in his room until a specially requested helicopter arrived to take him off the platform.
In March 2000, Mr. Overton had to sign a Return to Work Agreement as a condition of allowing him back offshore. This agreement required a commitment to responsibility and accountability, effective communication skills, and following guidelines and procedures. A violation of any of these tenets could result in Mr. Overton's termination.

Shift Change Incident And Termination
On July 20, 2000, Mr. Overton arrived at the heliport some time before 6:00 a.m. for a flight to the platform for his next hitch. When he arrived, someone stated that Mr. Holcomb was looking for Mike Volz ("Mr. Volz") and David Hanna ("Mr. Hanna"). Mr. Overton went to the parking lot to look for them. Mr. Overton went to check in on the flight manifest and was told he was too late because the helicopter was already fueled. Mr. Overton had to wait until the next flight to go to the platform. Once he arrived, Mr. Holcomb called him into a meeting and Ms. Sistrunk was on the phone. Mr. Overton was accused of being late for the flight because of a new rule that crew members must arrive at the heliport no less than thirty minutes prior to the scheduled flight time. Mr. Overton was unaware of this rule. Pursuant to their discussion, Mr. Overton was placed on suspended status. On July 27, 2000, Shell terminated Mr. Overton for allegedly violating his Return to Work Agreement by allegedly missing the helicopter flight on July 20, 2000.
On October 30, 2000, Mr. Overton filed his First Supplemental and Amended Petition for Damages. The petition incorporated further details, as above mentioned, regarding Shell's alleged retaliatory actions against Mr. Overton. On March 26, 2002, Mr. Overton filed his Second Supplemental and Amended Petition for Damages, which seeks to incorporate the complaint Mr. Overton filed in the EDLA and establish May 5, 1998, as the beginning date of "protected activity" under the Louisiana Environmental Whistleblower Statute *410 and further states facts regarding Shell's alleged retaliation.

Trial
The parties proceeded to a five day bench trial. During the trial, the trial court dismissed Mr. Landry and Mr. Pilney from the suit with prejudice. The trial court's judgment on April 5, 2005, held that Shell's termination of Mr. Overton was retaliation for being a whistleblower and ordered Shell to pay $609,586.20. The trial court allotted the damage award as follows:

 Lost wages $ 9,715.07
 Lost pension benefits $ 151,868.33
 Lost employment benefits $ 16,612.00
 Emotional distress $ 25,000.00
 Subtotal $ 203,195.40
 Trebled x 3
 Total $ 609,586.20

The trial court further ordered that Mr. Overton submit a motion to assess attorney's fees and costs within thirty days. Shell suspensively appeals the April 5, 2005 judgment.
Shell asserts many assignments of error. As to liability, Shell avers that the trial court erred by finding that Mr. Overton was terminated in retaliation for being a whistleblower. Shell also asserts the trial court erred in awarding lost pension benefit damages, lost fringe benefit damages, lost wages, and emotional distress damages. Shell also asserts the trial court erred by trebling interest and prejudgment interest.

STANDARD OF REVIEW
Appellate courts review the trial court's findings of fact under a "manifest" error" or "clearly wrong" standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The Louisiana Supreme Court created a two prong test for overturning the factfinder's decisions, which includes: 1) finding the trial court's rulings have no reasonable factual basis and 2) the record indicates that the trial court's findings are wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The appellate court must determine, after reviewing the entire record, if the trial court's decision was clearly wrong or reasonable. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). This standard is partly based on the trial court's ability to better weigh witness credibility. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). If "two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883.
The trial court's legal findings are reviewed under the de novo standard. Balseiro v. Castaneda-Zuniga, 04-2038, p. 6 (La.App. 4 Cir. 8/17/05), 916 So.2d 1149, 1153. "A legal error occurs when a trial court applies the incorrect principles of law and such errors are prejudicial." Banks v. New Orleans Police Dep't, 01-0859, p. 3 (La.App. 4 Cir. 9/25/2002), 829 So.2d 511, 514.

LIABILITY
The Louisiana Environmental Whistleblower Statute ("Whistleblower Statute"), La. R.S. 30:2027, protects employees from retaliation for reporting possible environmental regulation violations. The pertinent section of La. R.S. 30:2027 in regards to liability states:
§ 2027. Environmental violations reported by employees; reprisals prohibited
A. No firm, business, private or public corporation, partnership, individual employer, or federal, state, or local governmental agency shall act in a retaliatory manner against an employee, acting in good faith, who does any of the following:

*411 (1) Discloses, or threatens to disclose, to a supervisor or to a public body an activity, policy, practice of the employer, or another employer with whom there is a business relationship, that the employee reasonably believes is in violation of an environmental law, rule, or regulation.
(2) Provides information to, or testifies before any public body conducting an investigation, hearing, or inquiry into any environmental violation by the employer, or another employer with whom there is a business relationship, of an environmental law, rule, or regulation.
. . .
B. (2)(a) The term "action is taken" shall include firing, layoff, lockout, loss of promotion, loss of raise, loss of present position, loss of job duties or responsibilities, imposition of onerous duties or responsibilities, or any other action or inaction the court finds was taken as a result of a report of an environmental violation.
The employee claiming protection under the Whistleblower Statute must show that he was acting in good faith. Barron's Law Dictionary defines good faith as "a total absence of any intention to seek an unfair advantage or to defraud another party; an honest and sincere intention to fulfill one's obligations." BARRON'S LAW DICTIONARY 220 (4th ed.1996). Black's Law Dictionary states that good faith is an "intangible and abstract quality with no technical meaning or statutory definition." BLACK'S LAW DICTIONARY 693 (6th ed.1990). "[A]n honest belief, the absence of malice and the absence of design to defraud or to seek unconscionable advantage ...." Id. He must also prove a causal connection between the protected activity and the alleged retaliatory actions. Chiro v. Harmony Corp., 99-0453, p. 6 (La.App. 1 Cir. 11/5/99), 745 So.2d 1198, 1201. However, the protected activity need not be the sole reason behind the employer's alleged retaliatory conduct. Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir.1996), citing De Anda v. St. Joseph Hosp., 671 F.2d 850, 857 n. 12 (5th Cir.1982). The whistleblower must show illicit motivation for the employer's alleged retaliatory actions. Powers v. Vista Chem. Co., 109 F.3d 1089, 1094 (5th Cir.1997).
The plaintiff in a Louisiana tort action must prove his case by a preponderance of the evidence. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993), citing Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). "A preponderance of the evidence means evidence of greater weight or evidence which is more convincing than that offered in opposition to it." ODECO Oil & Gas Co. v. Nunez, 532 So.2d 453, 457 (La.App. 1 Cir.1988). "Proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not." Lasha, 625 So.2d at 1005, citing Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151, 155 (1971).
Shell alleges that the trial court erred by finding that Mr. Overton was in good faith, that allegedly violating the Return to Work Agreement constituted a pretextual reason for firing Mr. Overton, and that Shell had illicit motivation to fire Mr. Overton. Therefore, it contends that it should not be liable under the Whistleblower Statute.
Mr. Overton's first act of protected activity was the complaint he filed in the EDLA in May 1998 in which he alleged that Shell did not disclose the falsification of MMS reports to MMS or the Department of Interior. Specifically, Mr. Overton alleged that Shell violated the Louisiana Hazardous Waste Control Law, La. *412 R.S. 30:2172, the Outer Continental Shelf Act, 43 U.S.C. § 1331, and other MMS regulations, as well as other state and federal environmental provisions. Shell received service of this lawsuit and was put on notice that Mr. Overton was involved in protected activity pursuant the Whistleblower Statute.
The case sub judice was filed after Mr. Overton was disciplined for allegedly "dialing out" or illegally increasing the pressure settings on Jacket 20 at EI189B. The resulting one week suspension without pay was Mr. Overton's first discipline. The contract worker that falsified the MMS report was no longer allowed to work on Shell platforms and was the last person with access to the settings on Jacket 20. At trial, Frank Ainsworth, a position operator, and Sherman Marcantel, a worker for Danos and Curole, testified that they witnessed the contract worker throwing out Mr. Overton's range chart for Jacket 20. Therefore, there was no proof that Mr. Overton "ramped up" Jacket 20 to 1,200 psi and not to around 800 psi as he indicated. Nonetheless, Mr. Overton was disciplined for the incorrect pressure settings and filed suit. As of that time, Mr. Overton was a whistleblower because he disclosed "an activity, policy, practice of the employer . . . that the employee reasonably" believed was "in violation of an environmental law, rule, or regulation." La. R.S. 30:2027.
Shell transferred Mr. Overton to BM26 in 1999 where he had a "counseling" session because he used torque-seal to ensure that no other crew members changed his valve settings. The incident caused him to receive an evaluation of "Does Not Consistently Meet Expectations." This was Mr. Overton's lowest evaluation, so far, in his history of working for Shell.
In July 1999, Mr. Overton arrived for his first day of work on MP 310 and Mr. Tauriac instructed him to keep a bucket of soap full for the WEMCO unit. Mr. Overton testified that he thought that using the soap as a surfactant to hide an oil sheen was illegal, but that he was unsure at the time. He told Mr. Tauriac that the WEMCO should be shut down until the problem could be resolved. Mr. Tauriac disregarded this and further instructed Mr. Overton to fill the bucket with soap. Mr. Overton left the WEMCO and phoned the Department of Interior from his quarters. He spoke with Mr. Tregre, who confirmed the illegality and instructed Mr. Overton to add soap to the bucket and to take notes. As a result, Mr. Overton was suspended for 84 hours and instructed to create a Corrective Action Plan. Mr. Overton testified that he was placed in an awkward position his first day on MP310 and had to follow the orders of Mr. Tauriac. Ms. Sistrunk testified that Mr. Overton was disciplined for violating Shell's Code of Conduct because he did not report his suspicions about the soap to someone else at Shell. However, Mr. Overton questioned Mr. Tauriac and then reported his suspicions to the Department of Interior. Paul Kelone, an independent witness working for Production Management who was in the process of buying a Shell platform, testified that he witnessed Shell employees soaping WEMCO lines for about six weeks while he was on the platform.
Mr. Overton formally told Ms. Sistrunk that he was a whistleblower on December 22, 1999. Ms. Sistrunk stated in her deposition that she was "personally disappointed." On January 19, 2000, federal agents boarded the platform to issue grand jury subpoenas regarding complaints made by Mr. Overton. A few hours after the federal agents left, Ms. Sistrunk and Mr. Holcomb called Mr. Overton into a meeting to give him his annual Performance Evaluation. Mr. Overton received a "Marginal" *413 rating, the worst in his career at Shell. This rating also required him to sign a Corrective Action Plan and a Personal Development Plan. Mr. Overton was instructed to go directly to his quarters, not to talk to anyone, and wait for a helicopter to take him off the platform.
Ms. Sistrunk testified at trial that there was no way to prove that the evaluation was filled out prior to the federal agents arrival. Mr. Holcomb also stated in his deposition that there were no written documents to confirm the completion date of Mr. Overton's evaluation. Mr. Holcomb stated that no documents could confirm that the helicopter was prearranged.
Following Mr. Overton's training at the Robert training center, Ms. Sistrunk made him sign a Return to Work Agreement. The agreement confirmed Mr. Overton's commitment to responsibility and accountability, effective communication skills, and following guidelines and procedures. A violation of any of these tenets could result in Mr. Overton's termination. Before Mr. Overton returned to work, Mr. Holcomb testified that he instructed the crew to watch Mr. Overton.
On July 20, 2000, Mr. Overton was scheduled to begin working offshore again. He arrived at the heliport before the 6:00 a.m. flight. However, he was told that he was too late and would have to take the next flight. This resulted in Mr. Overton missing crew change and being late for his shift. Once he arrived on the platform, he met with Mr. Holcomb and Ms. Sistrunk, via speakerphone, concerning his late arrival. They instructed him that he violated his Return to Work Agreement by arriving late. They also informed Mr. Overton that he violated a Shell policy that required all crew members to arrive at the heliport at least thirty minutes prior to departure. Mr. Overton was unaware of this policy. On July 27, 2000, Mr. Overton was terminated for violating his Return to Work Agreement.
Ms. Sistrunk testified that Mr. Overton was terminated because he violated his Return to Work Agreement and not specifically for missing the helicopter flight. However, Mr. Overton violated that agreement by missing the helicopter flight. Mr. Holcomb also stated in his deposition that missing the flight was the only reason Shell terminated Mr. Overton.
The trial court found the heliport incident suspect. First, Shell's investigation notes document that Mr. Volz, Mr. Hanna, and Brian Macklin were also unaware of Shell's new thirty minute arrival policy. Mr. Volz and Mr. Hanna also arrived at almost the same time as Mr. Overton, yet they were allowed on the helicopter and escaped discipline for not arriving thirty minutes early. Mr. Holcomb also admitted in his deposition that he may have told the dispatcher that some people were outside, but had not come in yet. He also stated that he assumed that Mr. Volz and Mr. Hanna were in the parking lot because they had never missed a flight. However, Mr. Overton had never missed a flight. Mr. Holcomb also stated that Mr. Hanna told him that he had seen Mr. Overton at the heliport. Ms. Broussard testified that both Mr. Volz and Mr. Hanna stated that they saw Mr. Overton at the heliport.
After reviewing all of the evidence in the record, we cannot find that the trial court manifestly erred, was clearly wrong, or legally wrong when it stated that Shell's "handling of the July 20, 2000 incident was an arbitrary application of its policies." Mr. Overton appeared to be acting in good faith because he was acting without malice and without any intentions of obtaining an unfair advantage or of defrauding anyone. Mr. Overton tried to fulfill his job requirements and his obligation to the environment *414 as an offshore employee by complying with environmental regulations. He also stated that he was unsure if soaping the WEMCO line was illegal. Additionally, his original suit filed in 1998, stemmed from his duty to monitor pressure settings on valves and the only evidence to validate his claim that he set the pressure at 800 psi was thrown away by a contract worker. Good faith in regards to the Whistleblower Statute determines Mr. Overton's status and not Shell's Code of Conduct.
Evidence supported a causal connection between Mr. Overton's continuous reports of environmental violations and his disciplinary record. Mr. Overton's evaluations deteriorated with his continued complaints regarding Shell practices, and it eventually led to his termination. The arbitrariness of Shell's application of the new thirty minute heliport rule also demonstrates illicit motivation. The Louisiana Supreme Court stated, in a compensation case, that "[a]n employer cannot simply invent a violation of a safety rule or stretch the facts of a situation out of context so he has an excuse for firing an employee . . . ." Ducote v. J.A. Jones Constr. Co., 471 So.2d 704, 707 (La.1985). As such, we find that the alleged violation of the Return to Work Agreement was a pretextual reason for Shell's motivation for terminating a repeated whistleblower.

DAMAGES
Having affirmed the trial court's determination of Shell's liability under the Whistleblower Statute, we now examine the damage awards. Mr. Overton became a whistleblower in 1998 and the case sub judice commenced in June 1999, prior to the July 9, 1999 amendment of the Whistleblower Statute to its present wording used by the trial court. As such, the Whistleblower Statute of June 1999, must be applied to this case. Louisiana Revised Statutes are not applied retroactively unless "expressly so stated." La. R.S. 1:2. Therefore, we find that the trial court committed error by using the present version of the Whistleblower Statute. The damages section of La. R.S. 30:2027, in June 1999, read as follows:
B. (1) Any employee against whom any action is taken as a result of acting under Subsection A of this Section may commence a civil action in a district court of the employee's parish of domicile, and shall recover from his employer triple damages resulting from the action taken against him and all costs of preparing, filing, prosecuting, appealing, or otherwise conducting a law suit [sic], including attorney's fees, if the court finds that Subsection A of this Section has been violated. In addition, the employee shall be entitled to all other civil and criminal remedies available under any other state, federal, or local law.
(2)(a) The term "action is taken" shall include firing, layoff, lockout, loss of promotion, loss of raise, loss of present position, loss of job duties or responsibilities, imposition of onerous duties or responsibilities, or any other action or inaction the court finds was taken as a result of a report of an environmental violation.
(b) `Damages' for the purposes of this Section shall include, but not be limited to, lost wages, lost anticipated wage due to wage increase, or loss of anticipated wages which would have resulted from a lost promotion, any property lost as a result of lost wages, lost benefits, and any physical or emotional damages resulting therefrom. (Emphasis added).
The above version of the Whistleblower Statute does not include the three year *415 limitation on trebled damages that the present version includes.

Lost Wages
Shell avers the "District Court's award of $9,715.07 (trebled to $29,145.21), lacks sufficient record evidence" to support the award. The Louisiana Supreme Court held that the trial court has broad discretion for awarding lost wages as long as a "factual basis" for the award exists. Driscoll v. Stucker, 04-0589, p. 29 (La.2005), 893 So.2d 32, 53. "[T]he amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim, and such proof may consist only of the plaintiff's own testimony." Id. Lost wages should be determined to a reasonable certainty. Id. Courts can determine damage awards even if it "cannot be exactly estimated . . . based upon all the facts and circumstances of the case." Jordan v. Travelers Ins. Co., 257 La. 995, 1006-07, 245 So.2d 151, 155 (1971).
Holly Sharp ("Accountant Sharp"), CPA, CFP, CFE, Mr. Overton's forensic accountant, testified that she reviewed Mr. Overton's Shell earning statements, social security statement, W-2s, income tax returns, and payroll records from Mr. Overton's subsequent jobs. Accountant Sharp calculated Mr. Overton's back-pay from July 27, 2000, to be $62,490, with overtime. She included the $5,000 bonus that Mr. Overton did not receive as a result of his "Marginal" rating following the issuance of the grand jury subpoenas. Accountant Sharp calculated actual losses of $27,102 for remaining back-pay and $20,076 for front pay from the trial date for twenty-four months.
Dan Cliffe ("Accountant Cliffe"), CPA, Shell's forensic accountant, testified that Mr. Overton's loss of back-pay was $6,300 without including overtime. However, Accountant Cliffe reviewed only evidence Shell provided and conducted no independent research for documents concerning Mr. Overton's earnings. Accountant Cliffe also did not consider overtime. He admitted that Mr. Overton would have made $51,725 without overtime in 2000 if Shell had not terminated his employment.
The trial court's Reasons for Judgment include no reasoning behind the $9,715.07 award. However, predicated on the fact that Mr. Overton obtained a new job within thirteen days of being terminated from Shell and given the varying calculations between both forensic accountants, one of whom conducted no independent investigations or calculations, we do not find that the trial court erred or committed an abuse of discretion in awarding $9,715.07 in lost wages.

Fringe Benefits
Shell alleges the trial court erred by awarding Mr. Overton $16,612 in fringe benefits. First, Shell asserts the award extends a year and a half past the trial date: $11,917 for pre-trial fringe benefits and $4,695 for post-trial benefits until December 31, 2006. Second, Shell alleges that Accountant Sharp incorrectly calculated Mr. Overton's benefits because she assumed that he did not pay a portion of the premium even though Shell deducted money from his paycheck to pay a portion of the premium.
Accountant Sharp examined Shell's benefits book. She testified that Mr. Overton received "a lot of fringe benefits that were not replaced by his new employment." These extra benefits included health insurance for his wife. Accountant Sharp calculated the amount of money Mr. Overton would have to pay "out of pocket" for the missing fringe benefits and then added calculations for the fringe benefits that were not replaced by his new employers. Her calculation included the loss of disability *416 insurance, dental coverage, and other fringe benefits not covered. Accountant Sharp calculated $16,612 in total loss of fringe benefits. Once Accountant Sharp discovered, while testifying at trial, that Mr. Overton paid part of his fringe benefit premiums, she stated that her calculations were still correct because Shell provided better benefits than the average or "low ball" figures she used to calculate health insurance, etc. She also included a credit for the value of benefits Mr. Overton received from his subsequent employers and placed values on "what's not being replaced."
Accountant Cliffe testified that Mr. Overton had "similar" benefits at his subsequent jobs. Therefore, he did not calculate a loss of fringe benefits for Mr. Overton. Once again, he did not conduct any outside research from the calculations that Shell provided.
Accountant Sharp admitted at trial that she calculated Mr. Overton's lost fringe benefits based on the premise that he did not pay partial premiums at Shell. However, she countered her mistake with the fact that Shell provided superior benefits and she used average or "low ball" numbers when she calculated Mr. Overton's loss. She also deducted money from her calculations for that paid by Mr. Overton's subsequent employers. Accountant Cliffe did not calculate the loss of any fringe benefits. Given the trial court's ability to weigh the credibility of witnesses and Accountant Sharp's explanations, we do not find that the trial court abused its discretion or committed manifest error in awarding $16,612 in lost employment benefits.

Pension
Shell asserts the trial court erred by awarding Mr. Overton $151,868.33 in lost pension benefits. Shell argues that Mr. Overton had no "evidentiary foundation" and lacked a "proper factual predicate." Shell also urges that all tort victims are required to mitigate their damages, even though it is an affirmative defense, and that Mr. Overton failed to mitigate pension losses.
"[M]any courts, in a variety of factual settings, have determined that pension benefits constitute deferred compensation for services." Andrepont v. Lake Charles Harbor and Terminal Dist., 602 So.2d 704, 708 (La.1992). The Louisiana Supreme Court has also noted that "employees who are illegally discharged are entitled to recover for lost retirement contributions, or corresponding pension benefits." Id. at 710. Additionally, the Louisiana Supreme Court has recognized the right to pension as a property right in community property. See Sims v. Sims, 358 So.2d 919 (La.1978); T.L. James & Co. v. Montgomery, 332 So.2d 834 (La.1976).
"The `plaintiff's interest' in a pension plan should be determined by considering. . . the amount of pension benefits the plaintiff would have received had he not been terminated . . . ." Rhodes v. Guiberson Oil Tools, 82 F.3d 615, 620 (5th Cir.1996). Speculative damage awards without a basis of detail or specificity are not permitted. Bieber-Guillory v. Aswell, 98-559, p. 10 (La.App. 3 Cir. 12/30/98), 723 So.2d 1145, 1151. Although the mitigation is an affirmative defense, the defendant bears the burden of proof. Taylor v. Tulane Med. Ctr., 98-1967, 98-1969, p. 4 (La. App. 4 Cir. 11/24/99), 751 So.2d 949, 954. Also, the plaintiff must only take "reasonable steps" to mitigate his damages. Aisole v. Dean, 574 So.2d 1248, 1253 (La. 1991).
Accountant Sharp reviewed Shell's pension plan and Mr. Overton's "Personal data as of August 11, 2000" as provided by Shell. Accountant Sharp used *417 "conservative growth rates," and used a three percent increase in salary. She also used a statistical "growth life" of sixteen additional years with a retirement age of 65. Using this method, Accountant Sharp calculated that Mr. Overton's "net present value" of his pension was $151,868. Accountant Cliffe admitted that his calculations were too low because they did not include the possibility of Mr. Overton working for Shell the remainder of his career. He further admitted that, based on the assumption that Shell continues to have a profitable company and the same kind of pension benefits, that Mr. Overton's present value of lost pension benefits was $144,000.
Shell asserts that the trial court did not consider the possibility of Mr. Overton losing his job to downsizing or that the pension plan could change. However, those are not factors considered by forensic accountants when calculating lost pension or retirement benefits. The trial court weighed the testimony of both forensic accountants. Accountant Sharp testified as to her thorough analysis, where as, Accountant Cliffe admitted that he did not calculate the lost pension with the consideration that Mr. Overton could work for Shell the remainder of his career. Based on Accountant Sharp's use of Shell's pension plan book, Shell's personal data on Mr. Overton, and statistic base calculations, we do not find that the award is speculative. Additionally, Mr. Overton could not be expected to refuse every job in his field because it lacked a similar pension plan to Shell's. Thus, we find the mitigation argument without merit. Therefore, we do not find the trial court committed error or abused its discretion by awarding $151,868.33 in lost pension benefits.

Emotional Distress
The trier of fact is granted broad discretion when awarding general damages. Guillory v. State Farm Ins. Co., 94-1405 (La.App. 4 Cir. 9/28/95), 662 So.2d 104, 116. The reviewing court alters the award only upon a finding of abuse of discretion. Id.
Mr. Overton testified that he felt isolated and that he sought psychiatric treatment several months before and after Shell terminated him. He stated that his psychiatrist, Dr. Spears, prescribed him the medication Serzone for depression. After termination, Mr. Overton testified that he felt withdrawn, isolated himself from his daughter, stopped sleeping normally, and quit his hobbies. He stated that it was one of the hardest times of his life and characterized it as "equivalent to a death."
Patricia Overton ("Mrs. Overton") testified that her husband felt like he was being treated differently after he filed the federal and state lawsuits against Shell. She stated that he started losing sleep, starting gaining weight, and stopped hunting, fishing, and hiking. Mrs. Overton also stated that Mr. Overton felt like he was being punished. She further testified that she felt that the stress in the house strained Mr. Overton's close relationship with their daughter. Mrs. Overton testified that Mr. Overton seemed "pretty depressed."
Dr. Shwery, Mr. Overton's expert psychologist, testified that he conducted a "battery of tests" on Mr. Overton, interviewed him and Mrs. Overton, and spoke with Dr. Spears. Dr. Shwery stated that Dr. Spears diagnosed Mr. Overton with a mild form of depression and anxiety. Dr. Spears independently diagnosed Mr. Overton with a depressive disorder after conducting the Beck Depression Inventory, the Beck Anxiety Inventory, the Incomplete *418 Sentences Blank Test, Shipley Institute of Living Scale, the Behavioral Medicine Diagnostic Test, and the Minnesota Multiphasic Personality Inventory ("MMPI"). He also testified that Mr. Overton had excessive guardedness and suspicion, but that the feelings were "consistent with someone who felt abused and retaliated against at work." Dr. Shwery confirmed Mrs. Overton's statements regarding changes in Mr. Overton. Dr. Shwery stated that psychologists administer tests because that is "the training and the province of the psychologist."
Dr. Shwery hand scored the MMPI he administered. Dr. Shwery stated that Dr. Ginzburg, Shell's expert witness, "ignored" the data that showed signs of depression on the MMPI test he administered. Lastly, Dr. Shwery stated that the causation of Mr. Overton's depression was related to his employment at Shell, the environmental issues, and his termination.
Dr. Ginzburg,[5] a certified psychiatrist, stated that more psychologists administer the MMPI in Louisiana than psychiatrists. He gave Mr. Overton the MMPI test, scored it by computer, and interpreted Mr. Overton's symptoms. He interviewed Mr. Overton, but not his wife or former doctor. Dr. Ginzburg stated that Mr. Overton had symptoms but they were "insufficient to raise to the level of a clinical diagnosis." However, he found that Mr. Overton's symptoms of depression were slightly elevated.
Upon a thorough review of the above testimony, we do not find the trial court's determination that Mr. Overton suffered emotional distress because of his conflicts with Shell was clearly wrong. Therefore, we do not find the trial court abused its discretion is awarding $25,000 for emotional distress.

TREBLED DAMAGES
First, Shell asserts several of the damage awards should not be trebled because they extend past three years. However, Shell misplaces reliance upon the current version of the Whistleblower Statute, which limits trebled damages to three years. As discussed above, the Whistleblower Statute in June 1999, when Mr. Overton filed the case sub judice, did not include a three year limitation on trebled damages. Therefore, we find this argument is without merit.

INTEREST
"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts." La. R.S. 13:4203. However, "penalty interest is entirely of the post-judgment variety, and thus is calculated only from the date the penalties are awarded until the date they are paid." Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382, 1389. Pursuant to this jurisprudence, we find the trial court erred in awarding Mr. Overton prejudgment interest on the trebled, penalty portion of the damages. Prejudgment interest should have been granted on the untrebled damage amount of $203,195.40.

TREBLED INTEREST
As stated above, we find that the trial court should not have granted prejudgment interest on the trebled portion of damages. Pursuant to the discussion of granting prejudgment interest on the trebled damage award, we find that the trial *419 court erred by ordering that prejudgment interest be trebled.
This Court must determine if the trial court erred by trebling post-judgment interest on the trebled damage award. The Whistleblower Statute authorizes the assessment of penalties against violators. "Statutes which authorize the imposition of a penalty are to be strictly construed." Hornsby v. Bayou Jack Logging, 04-1297, p. 12 (La.5/6/05), 902 So.2d 361, 369. The Whistleblower Statute does not provide for the trebling of interest. Therefore, we find that the trial court erred by ordering that post-judgment interest be trebled.

DECREE
For the reasons stated above, we affirm the trial court's finding that Shell terminated Mr. Overton because he was a whistleblower. We affirm the damages award as to lost wages, pension, fringe benefits, and emotional distress. However, we reverse the award of prejudgment interest on the trebled damage award and reverse the award of trebled prejudgment and post-judgment interest.
AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] The MMS is a bureau in the Department of the Interior that manages the nation's natural gas, oil and other mineral resources on the Outer Continental Shelf. The MMS inspects for violations of environmental regulations.
[2] Torque-seal is an orange substance used on platforms to mark the location of safety valve settings. If the setting is adjusted or moved, the orange seal is broken proving that someone changed the valve from the original setting.
[3] A WEMCO unit is the final discharge point for the water to be separated from the oil and released into the Gulf of Mexico/ocean.
[4] A 201 form alerts the Federal Government that there has been an unauthorized discharge into the ocean from the platform.
[5] During trial, the trial court entered into evidence another trial court's opinion that stated that Dr. Ginzburg was not a credible witness for determining the amount of expert witness fees owed him.