993 So.2d 803 (2008)
The UROLOGY CLINIC OF NEW ORLEANS, INC. APMC
v.
UNITED FIRE AND CASUALTY COMPANY, Lafayette Insurance Company, Hibernia Insurance Agency, L.L.C., and ABC Insurance Company.
No. 2008-CA-0444.
Court of Appeal of Louisiana, Fourth Circuit.
September 10, 2008.
*805 Lanny R. Zatzkis, Karen D. McCarthy, Yvette A. D'Aunoy, Zatzkis McCarthy & Associates, L.L.C., New Orleans, LA, for The Urology Clinic of New Orleans, Inc., A.P.M.C.
Howard B. Kaplan, Bernard, Cassisa, Elliott & Davis, A PLC, and Orr Adams, Jr., Metairie, LA, for Lafayette Insurance Company.
(Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR., Judge ROLAND L. BELSOME).
TERRI F. LOVE, Judge.
This appeal arises from the temporary closure of a urology clinic following Hurricane Katrina. The trial court found that the insurance policy covered the urology clinic's business interruption and awarded damages. Further, the trial court awarded penalties, attorney's fees, costs, and interest from the date of judicial demand. We find that the court did not commit manifest error in awarding damages and affirm. However, we find that the trial court erred in awarding 50% penalties, by assessing attorney's fees, and interest from the date of judicial demand and reverse.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
On August 29, 2005, when Hurricane Katrina ("Katrina") struck New Orleans, Dr. Susan McSherry ("Dr. McSherry") was the owner of the Urology Clinic of New Orleans, APMC ("Clinic"). The Clinic leased Suite 600 on the sixth floor of the McFarland Building ("McFarland") on the Memorial Medical Center Baptist Campus ("Memorial"). Dr. McSherry began to treat a few patients beginning on January 5, 2006. However, the Clinic remained officially closed until January 23, 2006, when the fire marshall certified that McFarland's fire alarm systems were operable and it could be opened to the public.
The Clinic filed a claim on its Commercial General Liability Policy ("Policy") containing business interruption insurance with Lafayette Insurance Company ("Lafayette"), on or about October 20, 2005, which was denied three times. The Clinic subsequently filed a petition against Lafayette, United Fire and Casualty Company ("UFCC"), Hibernia Insurance Agency, LLC ("Hibernia"), and ABC Insurance Company ("ABC").
*806 Lafayette filed a motion for summary judgment alleging that no covered cause of loss, i.e. wind, caused damage to the Clinic.[1] The Clinic settled with Hibernia and the trial court dismissed the Clinic's claims against UFCC. ABC was dismissed from the suit.
Following a trial on the merits, the trial court found that the Clinic's fire alarm system was not repaired until January 23, 2006, the date the fire marshall certified the building operable. The trial court awarded $187,846 in damages and 50% penalties, as well as attorney's fees, costs, and interest from the date of judicial demand. Both the Clinic and Lafayette filed motions for new trial, which were denied.
Lafayette filed a suspensive appeal from the judgment and the denial of its motion for new trial. The Clinic filed a motion to tax costs and attorney's fees. The trial court then awarded $65,000 in attorney's fees and $6,474.69 in costs. Lafayette filed a suspensive appeal of the judgment awarding attorney's fees and costs.

STANDARD OF REVIEW
Appellate courts review factual determinations made by the trial court using the manifest error or clearly wrong standard of review. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Reversing the trial court's factual findings requires that we find that no reasonable factual basis exists for the trial court's findings and that the findings are wrong or "manifestly erroneous" according to the record. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 883 (La.1993). The trial court has a "better capacity to evaluate live witnesses." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Thus, if the trial court's holding was reasonable, the holding was not manifestly erroneous. Norfleet v. Lifeguard Transp. Serv., Inc., 05-0501, p. 5 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 852.
The de novo standard is used by appellate courts when reviewing questions of law. Reed v. La. Citizens Prop. Ins. Corp., 07-1592, p. 2 (La.App. 4 Cir. 3/5/08), 980 So.2d 754, 756. The appellate court must determine if the trial court was legally correct. Fagot v. Parsons, 06-1528, p. 2 (La.App. 4 Cir. 5/9/07), 958 So.2d 750, 752.
Damage awards are not disturbed on appellate review unless there is an abuse of discretion. Overton v. Shell Oil Co., 05-1001, p. 21 (La.App. 4 Cir. 7/19/06), 937 So.2d 404, 417. This is due to the factfinder's "wide latitude" in awarding damages. Id.

BUSINESS INTERRUPTION INSURANCE
Lafayette asserts that the Clinic was not closed due to a covered cause of loss. The Policy states:
A. COVERAGE
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
Further, the Policy defines one of the covered properties as business income as follows:
e. Business Income

*807 We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Causes of Loss. We will pay only for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or damage.
Business Income means the:
1) Net Income (Net Profit of Loss before income taxes) that would have been earned or incurred; and
2) Continuing normal operating expenses incurred, including payroll.
The period of restoration is defined in the Policy as beginning with the date of the damage from the Covered Cause of Loss until the insured property is "repaired, rebuilt, or replaced with reasonable speed and similar quality."
The Policy also addresses an exclusion regarding utility services, which reads:
d. Utility Services
The failure of power or other utility services supplied to the described premises, however caused, if the failure occurs away from the described premises. But, if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss of damage caused by that Covered Cause of Loss.
Additionally, the Policy, as shown below, provides coverage for loss in conjunction with an ordinance or law:
1. Ordinance or Law Coverage
(1) Coverage A  Coverage for Loss to the Undamaged Portion of the Building
If a Covered Cause of Loss occurs to covered Building property, we will pay under Coverage A for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law that:
(c) is in force at the time of the loss.
Eric Yankovich ("Mr. Yankovich"), the director of plant operations for Memorial, testified that McFarland had wind damage to the roof vents, membrane, and hatches, which allowed water to enter McFarland. He also testified that the fire alarm system contained throughout the Clinic was damaged by high humidity levels from water intrusion. Mr. Yankovich stated that Risk Tech was hired to remediate the mold problems in McFarland.
Additionally, Chris Gage ("Mr. Gage"), a principal in Risk Tech and the senior project manager, testified that the Clinic had minor water damage to ceiling tiles. Although his report did not specifically note fire alarm damage, he stated that he oversaw the replacement of the sensors in the smoke alarms and strips for the strobes used in the fire alarm system. However, he did not know when the work on the fire alarm system was completed. Further, Mr. Gage testified that Lafayette never contacted him to inspect the Clinic.
The fire marshall did not certify McFarland until January 23, 2006, which would indicate the Clinic had returned to a "similar quality." The testimony established that wind driven water damaged a portion of the fire alarm system, which was required to be functional before the Clinic could be fully operational. Thus, the trial court found that the Policy states that business income is covered for this type of loss. Therefore, we do not find that the trial court committed manifest error in *808 finding that the Clinic had a covered cause of loss and awarding $187,846.

L.A. R.S. 22:658
Lafayette asserts that the trial court committed legal error in finding that it acted arbitrarily, capriciously, and without probable cause in denying the Clinic's claim for business income and assessing a fifty percent penalty or $93,923, pursuant to La. R.S. 22:658 and La. R.S. 22:1220. La. R.S. 22:658 is penal in nature and must be strictly construed. Sher v. Lafayette Ins. Co., 07-0757, p. 24 (La.App. 4 Cir. 11/19/07), 973 So.2d 39, 59, aff'd in part and rev'd in part, 07-2441; 07-2443 (La.4/8/08), 988 So.2d 186.
La. R.S. 22:658, at the time of the claim, read in pertinent part:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
....
(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220.
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due....
La. R.S. 22:1220 also states, in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
....

*809 (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings....

Arbitrariness and Capriciousness
Dr. McSherry testified that no one contacted her to assist in conducting an inspection of the Clinic.
Lafayette presented the testimony of Kurt Crispin ("Mr. Crispin"), the supervisor for UFCC. The file notes state that the Clinic submitted its claim on October 20, 2005. However, Mr. Crispin testified that the date was a clerical error and the claim was submitted on October 31, 2005. He stated that the Clinic's claim was assigned to Property Loss Consultants ("PLC"), an independent adjusting firm. Mr. Crispin testified that no evidence in the file indicated that PLC contacted Dr. McSherry. Neither claims representative assigned to the file inspected the interior or exterior of the property. However, an inspection of the outside of McFarland occurred on November 23, 2005.
The file contains no evidence that reflects an interior inspection was conducted at McFarland. However, a PLC report from December states that the adjuster did not enter McFarland because of the fire hazard. Mr. Crispin also testified that the landlord was never contacted to inquire about the damage to McFarland. Further, a second inspection was never requested to inspect the interior. Mr. Crispin stated that two denial letters were issued in spite of his knowledge that an interior inspection had never occurred at the Clinic. Further, Mr. Crispin testified that he personally did not investigate the extent of damage the Clinic sustained.
Lafayette's files document that no one inspected McFarland's interior to gauge the extent of damage to the Clinic. Further, Mr. Crispin testified that denial letters were issued despite his knowledge that the damage was unknown. Given that the trial court found that the Clinic sustained a covered loss and the above testimony regarding the lack of attempts made to assess the Clinic's damages, we find that the trial court did not commit manifest error in finding that Lafayette acted arbitrarily, capriciously, and without probable cause.

Retroactivity
Lafayette maintains that the trial court erred in applying the amended version of La. R.S. 22:658, which applies a fifty percent penalty and awards attorney's fees to the insured. The Clinic avers that the amended version of the statute, effective August 15, 2006, should apply because it maintains that the Clinic did not provide sufficient proof of loss until after August 15, 2006. In fact, the Clinic asserts that satisfactory proof of loss did not occur until after it filed suit.
The record reflects that the Clinic submitted proof of loss to Lafayette on July 26, 2006, in the form of a letter and attachments. The trial court's factual finding that the Clinic submitted a satisfactory proof of loss to Lafayette by July, 26, 2006, is inherent in its finding of arbitrary and capricious behavior. We do not find manifest error in the trial court's factual finding of the Clinic's proof of loss prior to *810 August 15, 2006. The Louisiana Supreme Court found that La. R.S. 22:658 is not retroactive. Sher v. Lafayette Ins. Co., 07-2441; 07-2443 (La.4/8/08), 988 So.2d 186, 196-97.
We find that the trial court committed legal error in applying the amended version of La. R.S. 22:658 when it found that the Clinic submitted proof of loss prior to August 15, 2006. Therefore, we amend the penalty award to twenty-five percent or $46,961.50.

ATTORNEY'S FEES
Lafayette asserts that the applicable version of La. R.S. 22:658 did not permit the award of attorney's fees. We found the pre-amendment version of La. R.S. 22:658 applicable in Sher and the case sub judice. Therefore, we find that the trial court committed legal error by awarding attorney's fees and reverse the award of $65,000.

LEGAL INTEREST
The trial court awarded interest from the date of judicial demand on the entire amount, including penalties. Lafayette avers that legal interest on penalties is determined from the date of judgment.[2]
The Louisiana Supreme Court has held that interest on penalties is assessed from the date of judgment. Sher, 07-2441; 07-2443, 988 So.2d at 198-99. The Clinic contends that the above represents new law and should not be applied retroactively absent thorough analysis. However, the Louisiana Supreme Court first addressed this issue in Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382, 1389, when it held that interest on penalties begins on the date of judgment.[3] Thus, "penalty interest is entirely of the post-judgment variety, and thus is calculated only from the date the penalties are awarded until the date they are paid." Overton, 05-1001 at p. 23, 937 So.2d at 418, quoting Sharbono, 97-0110, 696 So.2d at 1389. Therefore, we find that the trial court erred in its award of interest from the date of judicial demand.

DECREE
For the above stated reasons, we find that the trial court did not commit manifest error in awarding damages for business interruption and affirm. However, we find that the trial court erred by applying the amended version of La. R.S. 22:658, which provides for a fifty percent penalty and attorney's fees, and awarding legal interest from the date of judicial demand on attorney's fees and penalties and reverse.
AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] The trial court never addressed the motion for summary judgment on the merits allegedly due to untimely filing.
[2] Lafayette also asserts that legal interest on attorney's fees begins from the date of judgment. As we found that the trial court legally erred by awarding attorney's fees, the issue is pretermitted.
[3] While Sharbono examined penalties in the worker's compensation arena, we find its relevant application axiomatic.