973 So.2d 39 (2007)
Joseph SHER
v.
LAFAYETTE INSURANCE COMPANY; United Fire & Casualty Company; the United Fire Group; Robert Jones; Wes Swank; Fred Vanderbrook; and Property Loss Consulting, Inc.
No. 2007-CA-0757.
Court of Appeal of Louisiana, Fourth Circuit.
November 19, 2007.
Writ Granted January 11, 2008.
*46 James M. Garner, Darnell Bludworth, Lauren L. Hudson, Timothy B. Francis, Sher Garner Cahill Richter Klein & Hilbert, L.L.C., New. Orleans, LA, for Joseph Sher.
Robert A. McMahon, Jr. Howard B. Kaplan, William D. O'Regan, IV, Bernard, Cassisa, Elliott & Davis, APLC, Metairie, LA, Ralph S. Hubbard III, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA, for Lafayette Insurance Company.
James M. Garner, Darnell Bludworth, Timothy B. Francis, Kevin M. McGlone, Sher Garner Cahill Richter Klein & Hilbert, L.L.C., New Orleans, LA, Amicus Curiae, Xavier University of Louisiana.
Charles C. Foti, Attorney General, Baton Rouge, LA, Amicus Curiae, State of Louisiana.
John W. Houghtaling, II, James M. Williams, Gauthier, Houghtaling & Williams, L.L.C., Metairie, LA, Amicus Curiae, Gauthier, Houghtaling & Williams, L L C.
Kevin E. Cunningham Roedel Parsons Koch Frost Balhoff & McCollister, Baton Rouge, LA, Amicus Curiae, American Insurance Association.
Wm. Ryan Acomb, Adrianne L. Baumgartner, Charles L. Chassaignae, IV, Porteous, *47 Hainkel & Johnson, LLP, New. Orleans, LA, Amicus Curiae, The National Association of Mutual Insurance Companies.
Dominic J. Ovella, Sean P. Mount, Daniel M. Redmann, Hailey McNamara Hall Larmann & Papale, L.L.P., Metairie, LA, Amicus Curiae, Fidelity and Deposit Company of Maryland; Empire Fire arid Marine Insurance Company; Empire Indemnity Insurance Company; and Centre Insurance Company.
Edward D. Wegmann, Harry S. Hardin, III, Madeleine Fischer, Joseph J. Lowenthal, Jr., Jones Walker Waechter Poitevent Carrere & Denegre, L.L.P., New Orleans, LA, Robert Shulman, Howery LLP, Washington, DC, Amicus Curiae, The Administrators of the Tulane Educational Fund.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR., and Judge LEON A. CANNIZZARO).
TERRI F. LOVE, Judge.
This appeal arises from an insurance, claim resulting from damages related to Hurricane Katrina. Joseph Sher, the owner of a five-unit apartment building in New Orleans, contested the claim determination of his commercial insurer, Lafayette Insurance Company. Lafayette Insurance Company refused to pay additional funds asserting that Joseph Sher's property was not properly maintained and that the policy did not cover flood damages. The trial court held that the insurance policy was ambiguous and therefore covered flood damage. A jury determined Joseph Sher's damage awards and the trial court awarded attorney's fees and costs.
Lafayette asserts that the insurance policy is not ambiguous and that the damage awards are excessive. Joseph Sher alleges the trial court erred by not allowing evidence and jury charges relating to his alleged mental anguish. We find the insurance policy ambiguous and affirm the trial court's granting of the partial motion for summary judgment. We find that the 2006 amendments to La. R.S. 22:658 cannot be applied retroactively and adjust the penalty award accordingly. The trial court erred in awarding attorney's fees; therefore, we vacate the award. Lastly, we find the jury properly determined the property damage amounts and affirm as amended.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Hurricane Katrina ("Katrina") brought catastrophic loss to New Orleans on August 29, 2005. With the naturally occurring storm also came the failure of the levee system built and maintained by the United States Army Corps of Engineers, causing New Orleans to be inundated with water. Joseph Sher ("Mr. Sher") owned and lived in a five-unit apartment building ("Building") located at 1410 Broadway. Street. Three weeks prior to Katrina, Mr. Sher suffered three heart attacks, which required surgery and a hospital stay. He thought evacuating would be too strenuous and decided to remain in his apartment during the mandatory evacuation period.
During Katrina, Mr. Sher said that the Building shook, water came in around the windows, and it appeared that the walls were "weeping." Early Tuesday morning, August 30, 2005, Gayle Parmelee, one of Mr. Sher's tenants who remained with Mr. Sher in the Building during the mandatory evacuation period, observed water rising around the Building. The water inundated the basement level of the Building with approximately four feet of water. Mr. Sher later evacuated the Building in a *48 canoe and traveled to Baton Rouge to reside with one of his sons,
Mr. Sher first obtained his commercial all-risk[1] insurance policy ("Policy") on the Building with Lafayette Insurance Company ("Lafayette") in 1989. Mr. Sher[2] notified Lafayette of his insurance claim during the first or second week of September 2005. Lafayette assigned Mr. Sher's claim to Property Loss Consulting, Inc. ("PLC") around October 5, 2005, when Lafayette asserts it first learned of the claim. Following the initial inspection of the Building, Lafayette determined that most of the damage to the Building was not covered under the Policy because the damage was caused by lack of maintenance, disrepair, or flooding. Lafayette estimated Mr. Sher's covered damages at $3,307.09. Lafayette then subtracted a hurricane deductible of $1,000 and a premium price of $2,037, which meant Mr. Sher was issued a check for $270,09. Mr. Sher then began to dispute the covered damages with Lafayette.
Following a second inspection conducted by Fred Vanderbrook ("Mr. Vanderbrook"), a consulting engineer retained by Lafayette for inspection of the roof and interior of the Building, Lafayette issued a supplemental check to Mr. Sher for $2,484.99. Neither check was ever negotiated. Mr. Sher forwarded additional estimates and invoices for repairs to Lafayette that he felt the Policy covered. Lafayette did not tender payment for the estimates or invoices.
Mr. Sher filed a petition for insurance coverage, bad faith penalties, attorney's fees and costs, and bad faith breach of insurance contract on August 28, 2006, against Lafayette; United Fire and Casualty Company ("UFC"); the United Fire Group ("UFG"); Robert Jones ("Mr. Jones"); Wes Swank ("Mr. Swank"); Mr. Vanderbrook; and PLC. Lafayette asserted the declinatory exception of lis pendens in its answer, which was dismissed. UFC and UFG then filed a motion for summary judgment as a matter of law asserting that Mr. Sher had no claims regarding their liability. Mr. Sher then dismissed UFC and UFG without prejudice.
Mr. Vanderbrook filed a dilatory exception of vagueness/ambiguity. Mr. Sher then dismissed Mr. Vanderbrook without prejudice.
Lafayette then filed a motion for leave to file a third party demand against R. David Paulison, as the director of the Federal Emergency Management Agency, FEMA, and the National Flood Insurance Program ("NFIP"), which the trial court denied due to time constraints of the impending trial.
Mr. Sher filed a motion for partial summary judgment as a matter of law against Lafayette that the Policy covered his damages. The trial court then granted Mr. Sher's motion for partial summary judgment holding that the flood exclusion contained in the Policy was ambiguous; therefore, it covered "man-made events." Additionally, the trial court held that "Lafayette has not met its burden of proving" that Mr. Sher's "damage was not caused by a man-made event." Lastly, the trial court denied Lafayette's motion to strike an expert witness or to continue the trial.
Lafayette filed a motion in limine to exclude new theories of recovery not disclosed *49 prior to trial, which the trial court granted. Mr. Sher then filed a motion in limine to exclude limitations or exclusions not properly pled in Lafayette's answer as affirmative defenses, which the trial court granted finding that each exclusion or limitation needed to be specifically pled.
Lafayette followed with a motion in limine to exclude prejudicial statements. Lafayette wanted to preclude Mr. Sher from revealing to the jury that he was a Holocaust survivor. The trial court denied the motion to exclude prejudicial statements regarding the Holocaust on a limited basis.
The trial court bifurcated the trial into two phases, with the second phase pertaining only to the alleged arbitrary and capriciousness of Lafayette. After a five-day trial, including both phases, the jury awarded damages as follows:

Building Damage Above the Basement $ 175,850
Building Damage in the Basement $ 144,300
Lost Rents $ 17,350
Business Personal Property $ 31,577
Penalties Pursuant to La. R.S. 22:658 $ 184,538.50
____________________________________________________
TOTAL $ 558,615.50

The trial court reserved the amount of attorney's fees and costs, plus interest from the date of judicial demand until paid, for determination at a later date. Following the trial, Mr. Sher dismissed and reserved his rights against Mr. Jones, Mr. Swank, and PLC.
Lafayette filed a motion for a new trial or alternatively remittitur, which was denied. Lafayette then timely filed this suspensive appeal. The trial court assessed attorney's fees and costs as follows:

Costs Pursuant to La. C.C.P. art. 1920 $ 16,288.60
Costs Pursuant to La. C.C.P. art. 970 $ 42,020.29
Attorney's Fees Pursuant to La. C.C. art.
1997 and/or La. R.S. 22:658 $ 258,728
_______________________________________________________
TOTAL $317,036.89

Thus, the total amount assessed against Lafayette was $870,652.34.
Lafayette appeals asserting that the trial court erred by: 1) granting Mr. Sher's motion for partial summary judgment; 2) retroactively applying an amendment to La. R.S. 22:658; 3) awarding $258,728 in attorney's fees; 4) striking defenses other than flood and NFIP; 5) not allowing a credit for Mr. Sher's NFIP policy; 6) awarding $42,020.24 in costs pursuant to La. C.C.P. art. 970; 7) awarding legal interest on penalties and attorney's fees from the date of judicial demand; 8) entering judgment on the jury's finding of arbitrary and capriciousness; 9) entering judgment on the jury's award of $31,577 for business personal property ("BPP"); 10) entering judgment on the jury's award for lost rents; and 11) entering judgment on the jury's award for building damages. Mr. Sher answered the appeal asserting that the trial court erred in refusing to instruct the jury regarding damages for mental anguish and that the jury interrogatories should have included an opportunity to award such damages.

PARTIAL SUMMARY JUDGMENT
Lafayette asserts the trial court erred by granting Mr. Sher's motion for partial ,summary judgment and determining that the meaning of flood in the context of the Policy was ambiguous.
Appellate courts review summary judgments using the de novo standard of review. Denson v. Diamond Offshore Co., 06-0568, p. 3 (La.App. 4 Cir. 3/28/07), 955 So.2d 730, 732. To find genuine issues of material fact, the reviewing court examines the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." La. C.C.P. art. 966(B). If no genuine issues of material fact exist and the "mover is entitled to judgment as a matter of law," then summary judgment should be granted. La. C.C.P. art. 966(B). The mover bears the burden of proof. La. C.C.P. art. 966(C)(2).
*50 An insurance policy is a contract.[3] The Louisiana Civil Code states that the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. C.C. art.2045. Further, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art.2046. If a word in a contract is not defined in the document, it must be given its "generally prevailing meaning." La. C.C. art.2047. However, "[w]ords susceptible of different meanings must be interpreted' as having the meaning that best conforms to the object of the contract." La. C.C. art.2048. When determining the meaning best conforming to the object of the contract, the meaning must be one that renders it effective and not one that renders it ineffective. La. C.C. art.2049.
Provisions of a contract must be interpreted along with the contract in totem. La. C.C. art.2050. Although worded in general terms, a contract "must be interpreted to cover only those things it appears the parties intended to include." La. C.C. art.2051. "When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." La. C.C. art.2054. Ultimately, if doubt exists, "a provision in a contract must be interpreted against the party who furnished its text." La. C.C. art.2056. Thus, "[a] contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. C.C. art.2056.
The Policy contains the following water exclusion, in pertinent part:
B. EXCLUSIONS
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
. . . .
g. Water
(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mudflow;
(3) Water that backs up from a sewer or drain; or
(4) Water under the ground surface pressing on, or flowing or seeping through:
(a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings.
The Policy also contains a section entitled "SECTION VDEFINITIONS," which includes the definitions of words used in the policy. However, "flood" is not defined in this section.
The common intent of the parties in an insurance contract is to provide insurance coverage. The meaning of "flood" is not defined within the Policy. Therefore, it must be given its generally prevailing meaning. However, because "flood" is susceptible to different meanings due to *51 varying causes of floods, we must find a meaning that conforms to the object of the contract, which also renders the contract effective.
A review of the Policy reveals that the parties intended to cover and include all risks that were not specifically excluded or limited. Lafayette failed to specifically exclude all floods because of the ambiguity contained within the water exclusion. While the Policy states that it does not cover damage caused by a "flood," it also states that it does not cover "waves, tides, tidal waves," and the "overflow of any body of water . . . whether driven by the wind or not." This exclusion includes "flood," but then continues to list specific natural disasters that cause inundations of water, commonly labeled as "floods." For example, a varying cause of a flood can be man-made or natural, as documented in La. R.S. 29:762, which states that a "flood" is a "natural disaster."[4]
A contract must be interpreted to achieve its purpose. La. C.C. art.2054. The purpose of the Policy was to provide insurance coverage for all risks not specifically excluded or limited. Therefore, in case of any doubt, when interpreting a contract of a standard form, the contract must be interpreted against Lafayette as the issuer of the Policy.
As such, after a de novo, review, we make the legal determination that the Policy with Lafayette is ambiguous as it relates to the water exclusion because it is unclear what types of floods are excluded. Therefore, strictly construed against Lafayette, Mr. Sher is covered for the damage to the basement level of the Building.

MENTAL ANGUISH
Mr. Sher asserts that the trial court erred by refusing to instruct the jury as to general damages for mental anguish, inconvenience, and emotional distress.[5] He requested that the trial court include the following jury charges:
Plaintiff's Proposed Jury Charge Regarding General Damages
A finding that an insurance company breached the duty owed to its insured of good faith and fair dealing, pursuant to Louisiana Revised Statutes 22:1220, entitles the insured to recover penalties against the insurer for "any damages sustained as a result of the breach." Such damages may include general damages for mental anguish and emotional distress associated with the pursuit of the insurance claim, as well as aggravation and inconvenience.
La. R.S. 22:1220

Lewis v. State Farm Ins. Co., 41,527 (La.App. 2 Cir. 12/27/06), 946 So.2d 708, 728.

Reed v. Ricard, [sic] 97-2250 (La.App. 1 Cir. 11/18/98), 744 So.2d 13, 19.

Williams v. La. Indemn. Co., 26,887 (La.App. 2 Cir. 6/21/95), 658 So.2d 739, 743.
Plaintiff's Proposed Jury Charge Regarding Mental Anguish
The finding that an insurance company violated Louisiana Civil Code Article 1997 by engaging in a bad faith breach of contract supports an award of damages for inconvenience, anguish and the like resulting from the actions of the defendant.

*52 La. C.C. art.1997.

Modisette v. Am. Integrity Ins. Co., 297 So.2d 498 (La.App. 2nd Cir.1974).
Plaintiff's Proposed Jury Charge Regarding Mental Anguish
Damages for nonpecuniary losses such as emotional distress and mental anguish are also available under Louisiana Civil Code Article 1998, which allows recovery of such damages where the contract is intended to gratify a nonpecuniary interest.
The nonpecuniary interest need only be a "significant" object or cause of the contract, as opposed to the primary or exclusive object of the contract for such damages to be recoverable. Damages for nonpecuniary losses can be recovered where the contract is intended to gratify both pecuniary and nonpecuniary interests. Contracts pertaining to plaintiff's residence can satisfy such an objective. La. C.C. art.1998.

Young v. Ford Motor Co., 595 So.2d 1123, 1124 (La.1992).

Thomas v. Desire Comm. Hous. Corp., 98-2097 (La.App. 4 Cir. 7/19/00), 773 So.2d 755, 763.

Taylor v. Burton, 93-1348[sic] (La.App. 3 Cir. 3/6/98), 708 So.2d 531, 535-36.
Mr. Sher requests that this Court award him general damages of $500,000 for mental anguish, inconvenience, and emotional distress.
Rejecting a requested jury instruction constitutes an error of law when it is "prejudicial" by "materially" affecting the result and depriving "a party of substantial rights." Lam v. State Farm Mut. Auto. Ins. Co., 03-0180, p. 4 (La.App. 4 Cir. 4/1/05), 901 So.2d 559, 564, rev'd in part on other grounds, 05-1139 (La.11/29/06), 946 So.2d 133. The manifest error standard presumes the jury utilized the correct law. Rathey v. Priority EMS, Inc., 04-0199, p. 27 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 458, writ denied, 05-0789 and 05-0802 (La.5/6/05), 901 So.2d 1107, 1108.
De novo review will be used by the appellate court "if the jury applied the incorrect law because of erroneous jury instructions" and it "could have affected the jury's decision." Rathey, 04-0199, pp. 27-28, 894 So.2d at 459. "De novo review is used only if the jury charges precluded the jury from reaching a verdict based on the law and the facts.'" Chaisson v. Avondale Indus., Inc., 05-1511, p. 27 (La. App. 4 Cir. 12/20/06), 947 So.2d 171, 190, quoting Jones v. Liberty Mut. Ins. Co., 568 So.2d 1091, 1094 (La.App. 5th Cir.1990). "Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023.
"[I]t is well established that damages for mental anguish are recoverable in tort actions." Gele v. Markey, 387 So.2d 1162, 1164 (La.1980). The damages sought by Mr. Sher "are not recoverable for breach of lease or of any contract unless psychological gratification was the primary object of the contract." Buddy's Tastee No. 1, Inc. v. Tastee Donuts, Inc., 483 So.2d 1321, 1324 (La.App. 4th Cir. 1986). However, "courts have been willing to compensate victims of mental distress in contract cases which have elements of tort actions." Id. "[Blare allegations of depression and embarrassment" are not sufficient. Id. Louisiana law dictates "that the object of a contract of insurance is the payment of money." Dixon v. First Premium Ins. Group, 05-0988, p. 16 (La.App. 1 Cir. 3/29/06), 934 So.2d 134, 146, writ denied, 06-0978 (La.6/16/06), 929 So.2d 1291.
*53 The case sub judice presents a contract of insurance, the object of which is to pay money. There is no evidence that psychological gratification or nonpecuniary interests was the object of this Policy. The proffered testimony of Mr. Leopold Sher addresses Mr. Sher's alleged mental anguish. Mr. Leopold Sher contended that Mr. Sher was "sick in his heart and mentally and emotionally upset every single day." However, the record lacks evidence of Lafayette's actions, other than failure to pay, that would demonstrate that "the obligor intended, through his failure, to aggrieve the feelings of the obligee." La. C.C. art.1998. The evidence in the record does not rise to the level that would merit the award of mental anguish damages in a contractual based action as opposed to a delictual based action. As such, we find that the trial court did not commit an error of law by refusing to include Mr. Sher's proposed jury instructions as he was not materially or prejudicially affected or deprived of substantial rights.

FLOOD INSURANCE POLICY CREDIT
We pretermit the discussion of Lafayette's claim for a credit for flood insurance policy payments as no evidence in the record exists to establish Mr. Sher received payments from the NFIP.

STANDARD OF REVIEW
The remaining issues in the case sub judice pertain to factual determinations, legal issues, and damage awards, which require the appellate court to utilize the following standards of review.
Factual determinations are reviewed with the manifestly erroneous/clearly wrong standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Reviewing and reversing the factfinder's determinations involves a two-part test developed by the Louisiana Supreme Court. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The reviewing court must find that no reasonable factual basis exists for the trial court's findings and that the findings are wrong or "manifestly erroneous" according to the record. Id. The entire record must be reviewed to determine whether the factfinder was clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). The factfinder has a "better capacity to evaluate live witnesses." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Thus, "the appellate court must determine if the factfinder's decision was a reasonable one." Norfleet v. Lifeguard Transp. Serv., Inc., 05-0501, p. 5 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 852. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883.
Damage awards by the factfinder are not altered or reversed absent an abuse of discretion. Factfinders have "much discretion" when assessing damages. La. C.C. art. 2324.1. The damage amount is "entitled to great deference on review." Trunk v. Med. Ctr. of La. at New Orleans, 04-0181, p. 9 (La.10/19/04), 885 So.2d 534, 539, citing Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. Accordingly, the abuse of discretion standard is utilized. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993). Notwithstanding opposing viewpoints on an appropriate award, an abuse of discretion is found only if the award is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." Id. 623 So.2d at 1261.
Legal errors are reviewed by appellate courts with a de novo standard. Overton *54 v. Shell Oil Co., 05-1001, p. 8 (La.App. 4 Cir. 7/19/06), 937 So.2d 404, 410.

STRICKEN DEFENSES
Lafayette avers the trial court legally erred by not allowing it to present defenses other than the water exclusion and payments made under an NFIP policy. The trial court held that Lafayette did not specifically plead all of the exclusions from the Policy as affirmative defenses;[6] thus, the exclusions/limitations were waived. Lafayette's Answer included the following language:
Lafayette adopts the terms, conditions, coverages, exclusions and endorsements of its policy, as if copied herein in extensio, [sic] as a defense to petitioner's claims; Lafayette further pleads all defenses, exclusions, rights and remedies under the policy of insurance issued by Lafayette to petitioner.
Lafayette asserts that this pled the Policy in its entirety as an affirmative defense.
"[A] defendant's answer must set forth any matter constituting an affirmative defense." Pendleton, v. Smith, 95-1805, p. 5 (La.App. 4 Cir. 5/8/96), 674 So.2d 434, 437. See La. C.C.P. art. 1005. "An affirmative defense raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action." Allvend, Inc. v. Payphone Comm'ns Co., 00-0661, p. 5 (La.App. 4 Cir. 5/23/01), 804 So.2d 27, 30. The list of affirmative defenses contained in La. C.C.P. art. 1005 is "illustrative, not exclusive." Bienvenu v. Allstate Ins. Co., 01-2248, p. 5 (La.App. 4 Cir. 5/8/02), 819 So.2d 1077, 1079. "Whether an issue is an affirmative defense is a question of fact, determined by the circumstances of the individual case." Bienvenu, 01-2248, p. 5, 819 So.2d at 1080. "Reliance upon an exclusion in an insurance contract is considered to be an affirmative defense, which must be specially pleaded in defendant's answer." Pendleton, 95-1805, 674 So.2d at 437. "In the absence of such a pleading, no proof can be offered in connection with the exclusion." Id.
The purpose of specifically pleading an affirmative defense is to give fair notice to the plaintiff of the nature of defenses. Bienvenu, 01-2248, p. 6, 819 So.2d at 1080. Special pleading prevents "trial by ambush" and does not give the defendant an unfair advantage. Walters v. Metro. Erection Co., 94-0162 and 94-0475 (La.App. 4 Cir. 10/27/94), 644 So.2d 1143, 1147. Pleading an insurance policy "in extenso" does not meet the requirement that affirmative defenses be specifically pled. Dixie Say. and Loan Ass'n v. Pitre, 99-154, pp. 23-24 (La.App. 5 Cir. 7/27/99), 751 So.2d 911, 924-25, writ denied, 99-2867 (La.12/10/99), 751 So.2d 855.
Lafayette refers to two cases to support the assertion that pleading an insurance policy in extenso is sufficient as a general rule. Lafayette asserts that Brantley v. State Farm Ins. Co., 37,601 (La.App. 2 Cir. 1/28/04), 865 So.2d 265, and Levet v. Calais & Sons, Inc., 514 So.2d 153 (La.App. 5th Cir.1987), maintain the proposition that Louisiana appellate courts have ruled that pleading the policy is sufficient. We find these cases distinguishable from Dixie, as the cases do not establish a general rule that pleading a policy in its entirety complies with the requirements of La. C.C.P. art. 1005.
In Brantley, the trial court allowed the defendant to submit a handwritten answer, which asserted "all defenses under the policy" *55 on the day of trial. 37,601 at pp. 8-9, 865 So.2d at 270. The plaintiffs alleged that they were prejudiced by the ruling because no continuance was granted. Brantley, 37,601, p. 8, 865 So.2d at 270. The trial court gave the plaintiffs an opportunity to file a motion for summary judgment following the filing of the answer and prior to the recommencement of trial, which they declined. Id. The appellate court found that "[Nosed upon this record," the trial court was not clearly wrong "in finding that the answer was sufficient and in denying the motion to strike." Brantley, 37,601, p. 9, 865 So.2d at 270.
Similarly limited to particular facts and circumstances, in Levet, the defendant and the defendant's insurer pled the insurance policy "in extenso." 514 So.2d at 160. However, the defendant and the plaintiffs opposed the insurer's motion to limit liability based on the fact that the policy limits were not specifically pled. Levet, 514 So.2d at 160. The appellate court found that the policy limit was deemed admitted because of the failure to respond to a request for admissions. Id. Like Brantley, the appellate court did not hold as a general rule that pleading a policy "in extenso" was sufficient to comply with La. C.C.P. art. 1005. Thus, neither appellate court found, as a general rule, that specific provisions of an insurance policy, intended to be used as affirmative defenses, need not be pled if the answer states that the defendant pleads the policy or the policy in extenso.
Thus, given the nature and purpose of affirmative defenses and that Lafayette did not specifically plead defenses other than NFIP and the water exclusion, we find that the trial court did not commit legal error in precluding the presentation of other defenses, as in extenso is insufficient to plead other exclusions and limitations of the Policy.

BUSINESS PERSONAL PROPERTY
Lafayette maintains that the trial court committed legal error by allowing evidence of Mr. Sher's BPP into evidence and submitting the issue to the jury because it claims the Policy did not cover Mr. Sher's BPP due to the lack of a BPP limit or information on the declarations page of the Policy. However, Lafayette failed to plead that the Policy did not cover BPP as an affirmative defense. Additionally, Lafayette never raised it in a reservation of rights. Thus, Mr. Sher asserts that this affirmative defense was waived. Lafayette moved for a directed verdict on the issue of BPP at the close of Mr. Sher's case-in-chief, which the trial court denied.
The Policy states, on the "Building and Personal Property Coverage Form," in pertinent part:
A. COVERAGE
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
1. Covered Property
Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:
a. Building meaning the building or structure described in the Declarations, including:
(1) Completed additions;
(2) Permanently installed:
(a) Fixtures;
(b) Machinery; and
(c) Equipment;
(3) Outdoor fixtures;
(4) Personal property owned by you that is used to maintain or service *56 the building or structure or its premises, including:
(a) Fire extinguishing equipment;
(b) Outdoor furniture;
(c) Floor coverings; and
(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;
The form referenced above also includes the following section regarding BPP, in pertinent part:
b. Your Business Personal Property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal PropertySeparation of
Coverage form:
1) Furniture and fixtures;
(2) Machinery and equipment;
(3) "Stock;"
(4) All other personal property owned by you and used in your business;
(5) Labor, materials or services furnished or arranged by you on personal property of others;
(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:
(a) Made a part of the building or structure you occupy but do not own; and
(b) You acquired or made at your expense but cannot legally remove;
(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.
Mr. Sher submitted a list of the contents he lost and the respective values into evidence. All of the items reported on Mr. Sher's list are covered by either the section under "building coverage," "BPP," or both. Irrespective of a finding that Lafayette waived the argument that the Policy does not cover BPP, there is not a definitive statement that the Policy does not include BPP. There is merely no reference to BPP specifically on the declaration page in the Policy. This creates ambiguity that is construed against Lafayette. Therefore, we find that the trial court did not commit legal error and the jury was neither manifestly erroneous nor abused its discretion by awarding Mr. Sher $31,577 for BPP.

LOST RENTS
Lafayette contends the trial court erred by entering judgment on the jury's award for $17,350 in lost rents. Lafayette claims the lost rents award should be reduced to $4,600 because it states the loss from Apartment E was based on flood damage and the loss from Apartments A and C was based on post-Katrina valuations. In order to arrive at $4,600, Lafayette did not include $8,550 for Apartment E and used the pre-Katrina valuations of $700 a month for Apartments A and C.
Mr. Leopold Sher, Mr. Sher's son, testified as to the amount of rent Mr. Sher lost following Katrina because of the damage to the Building. He stated that the rent for both Apartments A and C prior to Katrina was $700 each and Apartment E was $450. He further stated that, after reviewing the prices in the post-Katrina market, both Apartments A and C each had a monthly value of $1,400 and Apartment E $450. Mr. Sher also testified as to these valuations. The jury determined Mr. Sher's lost rents as follows: *57 

Apartment A: $400 + ($1,400 × 2, months) $ 3,200
Apartment C: $1,400 × 4 months $ 5,600
Apartment E: $450 × 19 months $ 8,550
__________________________________________________
TOTAL $17,350

The Policy includes a section on business income coverage, which reads, in pertinent part:
A. COVERAGE
Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the. Declarations;
(i) Business Income including "Rental Value".
. . . .
We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration".
The Policy covers Mr. Sher's "actual loss" of business income.
As we found above, the ambiguous water exclusion in the, Policy covers floods. Therefore, we find Lafayette's assertion as to the lost rents from Apartment E without merit. With respect to Apartments A and C, we find that the jury's award was not manifestly erroneous because the Policy covers actual loss. The jury had the opportunity to weigh Mr. Sher and Mr. Leopold Sher's credibility as to their study of post-Katrina valuations. If Mr. Sher could have leased Apartments A and C post-Katrina, then, according to Mr. Leopold Sher's testimony regarding the new rental market, he would have been able to collect $1,400 a month on each apartment. Therefore, we affirm the award of lost rents as the jury did not commit manifest error or abuse its discretion.

BUILDING DAMAGES
Lafayette maintains that Mr. Sher's building damages should be reduced for the following, reasons: 1) forty-five percent allowance for overhead and profit is gouging; 2) "water hammer" damages are not covered under the Policy; 3) there was no evidence of structural damage; 4) the jury's verdict is in excess of the amounts estimated by $50,000; and 5) Lafayette should get a credit for amounts paid.

Gouging
The jury awarded Mr. Sher $320,150 for damages, to the Building. Lafayette asserts that the award reflects a forty-five percent allowance for overhead and profit. Barry Scairono ("Mr. Scairono"), Mr. Sher's expert in architecture; water intrusion analysis; roofing; cost estimation; and construction administration, provided the estimates for repairing the upper level and basement level of the Building, which contained a twenty-five percent allowance for overhead and profit and a twenty percent allowance as an amount for unknown contingencies.
Mr. Scairono prepared an "opinion of probable repair costs" for the damage to the upper level of the Building and another for damage to the basement level of the Building. Mr. Scairono's estimates for repairs to the upper level and basement level of the Building were $134,850 and $144,300, respectively. These estimations included a twenty-five percent allowance for overhead and profit. Mr. Scairono testified that twenty-five percent was "reasonable" and "typical" for an overhead and profit allowance. He also stated that the Louisiana Office of State Facility Planning and Control, the entity that does the construction for the Louisiana, allows for a twenty-five percent allowance. A separate cost of twenty percent was included for contingency purposes. Mr. Scairono described the contingency as money included for "unidentified costs in construction jobs."
*58 Lafayette combined the percentage allocated for overhead and profit with that for contingency. However, due to the testimony of Mr. Sciarono, which differentiated the two calculations, we find neither manifest error nor abuse of discretion in the jury's determination.

Water Hammer
Lafayette avers that damages associated with the "water hammer" effect[7] should be subtracted from the jury's award because it was not covered under the Policy. However, the trial court ruled that Lafayette was precluded from asserting additional affirmative defenses that it did not specifically plead. We affirmed the ruling regarding additional affirmative defenses. Therefore, we find that this argument is precluded.

Structural Damage
Further, Lafayette contends that the award for structural damage should be reduced because Mr. Sher alleges structural damage that was not proven. Lafayette also avows that the amount the jury awarded Mr. Sher to inspect for structural damage should be deducted from the building damages award.
Roy Carubba ("Mr. Carubba"), Mr. Sher's expert in civil engineering, with a subspecialty in structural engineering, and as a contractor, testified that the Building cracked because it shook for two to three hours. Mr. Carubba testified that the porch moved from the wind and that constituted structural damage. He also stated that he believes there is "underlying structural damage" to the Building, but that cracks could appear without structural damage. In order to repair the structural damage he observed in the Building, Mr. Carubba stated it would cost approximately $42,410. Mr. Sciarono also testified that it would cost between $50,000 and $80,000 to determine whether there was further interior structural damage.
Dr. Jerry Householder ("Dr. Householder"), Lafayette's expert in construction and structural engineering, testified that there was no evidence of structural damage in the Building. However, Dr. Householder stated that he "hasn't seen any proof there is no structural damage."
Lafayette avows that the amount awarded by the jury for building damages exceeds the amount estimated by $50,000 because it presumes that the jury included the money to allow Mr. Sher to inspect for further structural damage to the Building.
The factfinder is allowed great discretion when awarding damages. "One injured through the fault of another is entitled to full indemnification for damages caused thereby." Hornsby v. Bayou Jack Logging, 04-1297, p. 5 (La.5/6/05), 902 So.2d 361, 365. The injured party should have his property restored "as nearly as possible to the state it was in immediately preceding the damage. . . ." Coleman v. Victor, 326 So.2d 344, 346 (La.1976). "The amount of damages is dependant on the facts of each case." Gulfstream Servs., Inc. v. Hot Energy Servs., Inc., 04-1223, p. 10 (La.App. 1 Cir. 3/24/05), 907 So.2d 96, 103.
Mr. Sciarono testified that it would cost between $50,000 and $80,000 for Mr. Sher to inspect for interior structural damage to the Building. Given this testimony and the facts of the case sub judice, we do not find that the jury committed manifest error by including money for a structural inspection in the total building damages award as the jury may have determined *59 that a structural inspection was necessary to properly restore the Building to its pre-Katrina condition.

Amounts Paid
We find that Lafayette should not receive a credit for amounts paid because Mr. Leopold Sher testified that the two checks Lafayette issued to Mr. Sher, totaling $2,755.08, were never negotiated.
In sum, the jury heard the testimony of experts and adjusters regarding the Building. It was in a better position to evaluate credibility and weigh the evidence in correlation with the witnesses. Accordingly, we find that the jury did not commit manifest error or an abuse of discretion by awarding Mr. Sher $320,150 for building damages.

ARBITRARY, CAPRICIOUS, & WITHOUT PROBABLE CAUSE
Lafayette maintains that it did not act arbitrarily, capriciously, or without probable cause by failing to timely pay Mr. Sher.
Statutes regarding the imposition of penalties on insurers for arbitrary and capricious conduct are penal in nature and must be strictly construed. Maurice v. Prudential Ins. Co., 02-0993, p. 9 (La. App. 4 Cir. 10/23/02), 831 So.2d 381, 388. The applicable revision of La. R.S. 22:658 states, in pertinent part:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
. . . .
(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220.
(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim.
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due. . . .
*60 La. R.S. 22:658. The applicable version of La. R.S. 22:1220 states, in pertinent part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
. . . .
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause. C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings. . . .
La. R.S. 22:1220.
The factfinder's determination that an insurer arbitrarily and capriciously handled a claim is a factual finding subject to the manifestly erroneous/clearly wrong standard. Calogero v. Safeway Ins. Co. of La., 99-1625, p. 5 (La.1/19/00), 753 So.2d 170, 173. Mr. Sher, as the insured, bears the burden of proving the alleged arbitrary and capricious behavior of Lafayette. Warner v. Liberty Mut. Fire Ins. Co., 543 So.2d 511, 515 (La.App. 4th Cir.1989). An insurer acts arbitrary and capricious "when its willful refusal of a claim is not based on a good faith defense . . . or is unreasonable or without probable cause." Calogero, 99-1625, p. 5, 753 So.2d at 173. "[I]f part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim." Warner, 543 So.2d at 515. Lafayette has an
affirmative duty to verify, through a reasonable investigation, whether a claim was actually excluded from coverage and when an insurer chooses to resist its contractual obligation based upon a supposed defense, which a reasonable investigation would have proved to be without merit, it acts at its peril and renders itself liable for statutory penalties and attorney's fees.
Deutschmann v. Rosiere, 02-2002, p. 6 (La.App. 4 Cir. 4/9/03), 844 So.2d 1082, 1086. Further,
[a]n insurer must take the risk of misinterpreting its policy provisions. If it errs in interpreting its own insurance contract, such error will not be considered as a reasonable ground for delaying the payment of benefits, and it will not relieve the insurer of the payment of penalties and attorney's fees.

LeBlanc v. Underwriters at Lloyd's, London, 402 So.2d 292, 299 (La.App. 3rd 1981), quoting Carney v. Am. Fire and Indem. Co., 371 So.2d 815, 819 (La. 1979).

Adjustment Initiation Within Thirty Days
Lafayette states that it did not receive notice of Mr. Sher's claim until *61 October 5, 2005, when the claim was assigned to Mr. Jones, a claims adjuster working for PLC through his company, Robert's Construction. Lafayette further asserts that Mr. Jones telephoned Mr. Sher on October 9, 2005, but did not speak with him. Mr. Jones testified that he made arrangements to inspect the Building on November 1, 2005.
Mr. Leopold Sher testified that he "notified" Lafayette of Mr. Sher's loss sometime during the first two weeks of September 2005. He stated that Mr. Jones spoke with him in October 2005. However, the Building was not inspected until November 1, 2005.
1361 Loss adjustment initiation "requires that The insurer take some substantive and affirmative step to accumulate the facts that are necessary to evaluate the claim.'" Hollier v. State Farm Mut. Auto. Ins. Co., 01-0592, p. 4 "(La.App. 4 Cir. 10/31/01), 799 So.2d 793, 797, quoting McClendon v. Economy Fire & Cas. Ins. Co., 98-1537, p. 7 (La.App. 3 Cir. 4/7/99); 732 So.2d 727, 731. Merely opening a file on a claim does not satisfy the statutory requirements. Hollier, 01-0592, p. 5, 799 So.2d at 797.
Considering the conflicting testimony from Mr. Leopold Sher and Lafayette as to the date. Lafayette received notice of Mr. Sher's claim, we cannot say that the jury was manifestly erroneous in accepting Mr. Leopold Sher's date. Thus, the jury determined that Lafayette did not initiate Mr. Sher's claim within the requisite thirty days due to the November 1, 2005, inspection date.

Building Damages Claim
Acknowledging that the Building suffered some wind damage due to Katrina, Lafayette asserts that it was not in bad faith because Mr. Sher did not submit sufficient evidence of all of the building damages claims. Additionally, Lafayette contends Mr. Scairono's estimates were not finalized. Lastly, Lafayette also maintains that the Building's damage was due to lack of maintenance.
Mr. Sher presented evidence that Lafayette inspected the Building in 1994, 2001, 2002, and 2003, during the Policy's term. All of the inspection reports contained documentation that Lafayette believed the property was well-maintained prior to Katrina.
Mr. Jones, the first adjuster, refused to assess damages to the basement level although Mr. Leopold Sher offered to show Mr. Jones the damage. Mr. Jones also testified that he did not assess the basement level. The record reflects that Mr. Leopold Sher repeatedly sent estimates and invoices to Lafayette to no avail.
Mr. Carubba testified that the Building was in very good condition considering its age. He stated that the Building cracked because it shook for two to three hours. Mr. Carubba testified that the cracks were white, which meant that the cracks were new and not made pre-Katrina.
Lafayette contends that Mr. Sher's building was not properly maintained. However, Mr. Vanderbrook, a consulting engineer retained by Lafayette for inspection of the roof and interior of the Building, testified that he never said that damage was from a lack of maintenance. Mr. Vanderbrook also stated that he did not think the Building was poorly maintained. Lafayette also ignored a letter from its parent agent, Stone Insurance, Inc. ("Stone"), which stated that Stone believed that the damage surveyed was caused by wind driven rain, which was covered by the policy.
After reviewing the evidence, we find that the jury did not commit manifest error *62 in finding that Lafayette failed to conduct a reasonable investigation into Mr. Sher's building damages. This is documented by Lafayette ignoring the letter from Stone, the multiple Lafayette inspection documents, which stated that the Building was well maintained, and by Mr. Jones refusing to survey the damage to the Building's basement level. As such, we do not find that the jury committed manifest error in finding that Lafayette was arbitrary and capricious when disputing Mr. Sher's claim regarding building damages.

Lost Rents Claim
Mr. Sher claimed the lost rents for three of the apartments in the Building, including Apartment E located in the basement level, at post-Katrina valuations. Lafayette contends that Mr. Sher cannot use post-Katrina valuations for this claim. However, the Policy states that it covers the "actual loss of Business Income."
Both Mr. Sher and Mr. Leopold Sher testified as to the claim for lost rents. Mr. Sher rented two apartments post-Katrina for $1,400 eath, resulting in his post-Katrina valuations. The only dispute regarded whether Mr. Sher was entitled to pre-Katrina or post-Katrina valuations. Therefore, Lafayette owed Mr. Sher $4,600 in undisputed lost rents. The record reflects that Lafayette never tendered payment to Mr. Sher for that $4,600. Lafayette failed to pay an Undisputed portion of Mr. Sher's claim, Which means that Lafayette is Subject to penalties on Mr. Sher's entire claim pursuant to Warner. Regarding the testimony presented, we find no manifest error in the jury's decision regarding Lafayette's arbitrary and capriciousness towards Mr. Sher's claim for lost rents.

Business Personal Property Claim
Lafayette maintains that no bad faith exists as to Mr. Sher's claim for BPP because the Policy did not cover BPP and avers that Mr. Sher did not claim the BPP before litigation.
Mr. Sher asserts that whether his claim for BPP was disputed in good faith is irrelevant due to the fact that the failure to pay lost rents and property damage was in bad faith, which dictates that the trial court assess penalties on Mr. Sher's entire claim pursuant to Warner. We find that this argument has merit and pretermit a discussion on the dispute over BPP.

Flood Claim
Lafayette states that no Louisiana state court has found that flood damage is covered by a "non-flood policy." Mr. Sher states that the flood claim is a "non-issue" because the lost rents and property damages were not disputed in good faith. We pretermit the discussion as it is moot since we find that the trial court correctly granted Mr. Sher's motion for partial summary judgment regarding the ambiguity of the water exclusion.
Accordingly, we find that the jury did not commit manifest error in finding that Lafayette was arbitrary, capricious, or without probable cause when it handled and denied Mr. Sher's claims under the Policy.

LA. R.S. 22:658:
Payment and adjustment of claims, policies other than life and health and accident; personal vehicle damage claims; penalties; arson-related claims suspension
Lafayette asserts the trial court erred by applying and submitting to the jury the amended version of La. R.S. 22:658 effective at the time of trial. The amended version of La. R.S. 22:658(B)(1) *63 increased penalties from twenty-five percent to fifty percent and added the award of attorney's fees and costs for arbitrarily and capriciously refusing to pay a claim within thirty days. The pre-amendment version of La. R.S. 22:658 read, in pertinent part, as follows:
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
The jury instruction regarding La. R.S. 22:658 was jointly submitted in its amended form to the trial court. However, Lafayette objected to the use of the amended form at trial.
"A trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of the particular case." Berthelot v. Stallworth, 03-1771, p. 8 (La.App. 4 Cir. 9/14/04), 884 So.2d 648, 653. Therefore, the trial court has a duty to present the correct law to the jury regardless of joint stipulated jury instructions. Louisiana Revised Statutes are not applied retroactively "unless it is expressly so stated." La. R.S. 1:2. Regarding retroactivity, the. Louisiana Civil Code provides guidance La. C.C. art. 6, which reads:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
As La. R.S. 22:658 contains no language regarding retroactivity, we must determine whether La. R.S. 22:658's penalty. percentage, attorney's fees, and cost awards constitute substantive or procedural changes. Patriot Am. Hospitality P'ship, LP v. Mississippi Land Holdings, Inc., 06-0601, p. 5 (La.App. 4 Cir. 12/13/06), 948 So.2d 249, 252, citing Davis v. Willis-Knighton Med. Ctr., 32,193, p. 3 (La.App. 2 Cir. 8/18/99), 738 So.2d 1191, 1193.
A statutory amendment changing the percentage of permitted penalties is substantive and cannot be applied retroactively. Francis v. Travelers Ins. Co., 581 So.2d 1036, 1044 (La.App. 1st Cir. 1991). "Therefore, the time when the right to the penalty comes into existence determines which penalty percentage applies." Id., citing Gulf Wide Towing, Inc. v. F.E. Wright (U.K) Ltd., 554 So.2d 1347 (La.App. 1st Cir.1989). "The right to a penalty comes into existence after the passage" of the time period provided by the statute. Francis, 581 So.2d at 1044. Although the parties dispute the exact date Lafayette received notice of Mr. Sher's claim, it is undisputed that the thirty-day. time period passed prior to the 2006 amendment to La. R.S. 22:658.
Thus, we find the trial court committed legal error by applying the amended version of La. R.S. 22:658. The trial court *64 applied a fifty percent penalty and awarded $184,538.50 in penalties pursuant to La. R.S. 22:658. Therefore, the pre-amendment version of La. R.S. 22:658, which allowed for a twenty-five percent penalty, applies and the amount of penalties awarded to Mr. Sher is reduced to $92,269.25.

ATTORNEY'S FEES
Lafayette asserts that the trial court erred in awarding $258,728 in attorney's fees pursuant to La. C.C. art.1997 and/or La. R.S. 22:658. As discussed above, if the attorney's fees were awarded based on La. R.S. 22:658, then we must eliminate the award for lack of retroactivity. However, the award of attorney's fees may have a basis in La. C.C. art.1997.
"An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. C.C. art.1997. The prevailing Louisiana principle states that "the right to recover attorney fees must be expressed by a statute or a contract." Rateliff v. Boydell, 93-0362, 92-0630 (La. App. 4 Cir. 4/3/96), 674 So.2d 272, 282. See also La. R.S. 22:1220. However, this Court opined that "attorney fees are not provided for in article 1997." Priority E.M.S. v. Crescent City E.M.S., 01-2171, p. 18 (La.App. 4 Cir. 10/16/02), 829 So.2d 1066, 1077. "Attorney's fees are not allowable in an action for breach of contract unless there is a specific provision therefor in the contract." Rye. v. Terminix Serv. Co., Inc., 423 So.2d 754, 757 (La.App. 4th Cir.1982). "[P]arties have an opportunity to stipulate in the contract that attorney's fees would be due in the event the contract is breached." Id.
In the case sub judice, Lafayette and Mr. Sher did not include a provision in the Policy to award attorney's fees in, case of a breach. Likewise, La. C.C. art.1997 does not provide for the award of attorney's fees. Finally, because we find that La. R.S. 22:658 cannot be applied retroactively, we vacate the trial court's award of $258,728 in attorney's fees.

LEGAL INTEREST
The trial court awarded Mr. Sher interest from the date of judicial demand on damages and penalties. Lafayette avers that no legal interest should be permitted. However, if this Court finds legal interest applicable, Lafayette contends that it should be calculated from the date of judgment.
The timeline applicable for awarding legal interest is bifurcated based upon whether the award is for damages or attorney's fees/penalties. Interest on damages is calculated from the date of judicial demand. Sharbono v. Steve Lang & Son Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382, 1386. This prejudgment interest "is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained control over the funds during the pendency of the action." Id. "However, `penalty interest is entirely of the post-judgment variety, and thus is calculated only from the date the penalties are awarded until the date they are paid.'" Overton, 05-1001, p. 23, 937 So.2d at 418, quoting Sharbono, 97-0110, 696 So.2d at 1389. See Becnel v. Lafayette Ins. Co., 99-2966, p. 13 (La.App. 4 Cir. 11/15/00), 773 So.2d 247, 254.
Therefore, we find that interest is owed from the date of judicial demand on Mr. Sher's, damage award of $351,727 and from the date of judgment on the penalty assessment of $92,269.25.

COSTS
Lafayette asserts there is no legal basis for the trial court's award of *65 $42,020.24 in costs pursuant to La. C.C.P art. 970 if this Court reduces Mr. Sher's awards to less than twenty-five percent more than his offer of judgment. La C.C.P. art. 970 provides that costs may be awarded to the prevailing party by the trial court if the final amount awarded is at least twenty-five percent greater "than the amount of the offer of judgment made by the plaintiff-offeror." La. C.C.P. art. 970. "[T]he offeree must pay the offeror's costs, exclusive of attorney fees, incurred after the offer was made, as fixed by the court." La. C.C.P. art. 970.
Mr. Sher made an offer of judgment on Lafayette on February p, 2006, for $225,000 "inclusive of costs, interest, attorney fees and any other amount which may be awarded Plaintiff against Lafayette in this matter." Lafayette refused the offer. Considering the amount owed by Lafayette, "inclusive of costs, interest, attorney fees and any other amount," after this Court's adjustments exceeds Mr. Sher's offer of judgment by at least twenty-five percent, we find no error in the award of documented costs pursuant to La. C.C.P. art. 970.

DECREE
Accordingly, we find that the trial court correctly granted Mr. Sher's motion for partial summary judgment in finding the water exclusion ambiguous. We find that the trial court did not commit legal error in striking additional defenses not specifically pled by Lafayette. Further, we do not find the jury committed manifest error in the awards for BPP, lost rents, or building damages. The trial court also properly refused to admit jury instructions regarding damages for mental anguish. The jury did not commit manifest error by determining that Lafayette acted arbitrary, capricious, and without probable cause by refusing to pay Mr. Sher's claim. However, we find that the trial court erred by applying La. R.S. 22:658 retroactively and awarding attorney's fees. The trial court also erred in awarding legal interest on penalties from the date of judicial demand. The trial court did not err in awarding costs pursuant to La. C.C.P. art. 970.
Thus, the awards are amended as follows:

Building Damage Above the Basement $ 175,850
Building Damage in the Basement $ 144,300
Lost Rents $ 17,350
Business Personal Property $ 31,577
Penalties Pursuant to La. R.S. 22:658 $ 92,269.25
________________________________________________________
TOTAL $461,346.25
Costs Pursuant to La. C.C.P. art. 1920 $ 16,288.60
Costs Pursuant to La. C.C.P. art. 970 $ 42,020.60
Attorney's Fees Pursuant to La. C.C. art.
1997 and/or La. B.S. 22:658 $ 0000.00
________________________________________________________
TOTAL $ 58,308.84

Lastly, legal interest is due from the date of judicial demand on the damage award and from the date of judgment on penalties.
AMENDED IN PART; AFFIRMED AND RENDERED AS AMENDED.
MURRAY, J., concurs in the result.
TOBIAS, J., concurs in the result and assigns reasons.
CANNIZZARO, J., concurs in part and dissents in part.
TOBIAS, J., concurring.
I respectfully concur in the result. Although I reach the same conclusions as the majority, I reach them differently because I disagree with the majority's analysis of the law and facts.
The Term "Flood"
I find the trial court's granting of the plaintiffs partial motion for summary judgment is error. I do not react the word "flood" in the contract of insurance as ambiguous at all. Rather, it is clear that *66 the word "flood" applied to any and all floods.
The precise language in the contract of insurance excluding damages caused by flood is contained in paragraph B., Exclusions, subpart 1.g. Water (1), to-wit:
Flood, surface water, waves, tides, tidal waives, overflow of any body of water, or their spray, all whether wind driven by wind or not;. . . .
In context, it is clear that "flood" includes flood from any source whatsoever, including surface water, waves, et cetera. The greater includes the lesser. By analogy, in the sale of real estate, over time, authentic acts of sale of immovables evolved to frequently say, "I hereby grant, bargain, sell, convey, transfer, assign, set over, abandon and deliver. . . ." No rational court today would hold that string of verbiage to be any different than if the vendor simply said, "I hereby sell. . . ."
Ultimately, however, the result in the case at bar is no different whether the majority or the trial court is correct or not in saying that flood does not include manmade floods. This is because Mr. Sher's premises sustained wind and water damage first from the force of the wind and rain of Hurricane Katrina. One may reasonably take judicial notice of this fact. La. C.E. art. 201. After the winds had settled down and the rain slacked, the levees broke and inundated large portions of the city of New Orleans, including 1410 Broadway Street. From this follows the assumption that wind and rain caused damages to the interior of Mr. Sher's property, including the basement area, prior to the flood. The subsequent flood caused additional damage to the basement. But what portion of the damage to the basement was caused by wind and wind driven rain and what portion was caused by flood? This is a question of fact for the trier of fact, whether jury or judge.
Further, I take judicial notice that water evaporates, especially in heat. Id. In the days following Hurricane Katrina, water from the wind-driven rain and the flood waters (which included brackish and/or salt water) evaporated within Mr. Sher's property. But which water (rain or flood) caused what damage? Again, that is a question of fact for the trier of fact.
Nor should one automatically read a "concurrent causation" clause in a contract of insurance as an excuse for an insurer, such as one in the position of Lafayette Insurance Company ("Lafayette"), as an automatic ground to exclude coverage under a windstorm insurance contract. Again, a question of fact may exist, at least in the following context: Did, the wind and rain cease or subside to a sufficient extent that the subsequent flood, although perhaps related to the wind and rain, constitutes a separate event such that reasonable minds could view them as non-concurrent?
In the case at bar, I can argue that the trial court's making a determination in advance of trial by the ruling on the motion for partial summary judgment that the term "flood" interdicted the jury's verdict so that this court would be required to conduct a de novo review of the record. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991). In such a context, this court would be required to disregard the jury's verdict entirely and render judgment on the record on appeal.
I have conducted such a de novo review, and cannot say to an absolute certainty that the dollar amount of damages that I reach is different from that of jury. Reasonable minds differ. Accordingly, I do not disagree with the majority's affirmation of the quantum of damages.
Pleading of Affirmative Defenses
I respectfully disagree with the majority's conclusion that Lafayette did not adequately *67 plead its affirmative defenses. As the majority notes, Lafayette's answer asserted the following:
Lafayette adopts the terms, conditions, coverages, exclusions and endorsements of its policy, as if copied herein in extensio [sic], as a defense to petitioner's claims; Lafayette further pleads all defenses, exclusions, rights and remedies under the policy of insurance issued by Lafayette to petitioner.
La. C.C.P. art. 1005 defines affirmative defenses as follows:
The answer shall set forth affirmatively arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, division, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, transaction or compromise, and any other matter constituting an affirmative defense. If a party has mistakenly designated an affirmative defense as an incidental demand, or an incidental demand as an affirmative defense, and if justice so requires, the court, on such terms as it may prescribe, shall treat the pleading as if there had been a proper designation.
Article 1006 of the Louisiana Code of Civil Procedure defines alternative defenses:
An answer may set forth two or more defenses in the alternative, even though the factual or legal bases thereof may be inconsistent or mutually exclusive. All allegations in such cases are made subject to the obligations set forth in Article 863.
Our Code of Civil Procedure is crystal clear that "[n]o technical forms of pleading are required." La. C.C.P. art. 854.
In my view, the paragraph of Lafayette's answer pleading the policy provisions as a defense is sufficient to raise all of the defenses that Lafayette needed to raise. That is, but for the contract of insurance between Joseph Sher and Lafayette, Mr. Sher would have no cause of action against Lafayette. Further, the precise language of La.C.C.P. art. 1005 does not list a policy of insurance as an item that must be specially pled as an affirmative defense. Accordingly, I find that Dixie Savings & Loan Ass'n v. Pitre, 99-154, (La.App. 5 Cir. 7/27/99), 751 So.2d 911, relied upon by the majority and holding that the pleading of a policy of insurance "in extenso" does not meet the requirement of asserting an affirmative defense, as an incorrect statement of law. Rather, Brantley v. State Farm Ins. Co., 37,601, (La.App. 2 Cir. 1/28/04), 865 So.2d 265, which held to the contrary of Dixie Savings, appears to me to be a more accurate statement of the law.[1]
In the alternative, I find that Lafayette's defense that its policy does not provide business personal property loss coverage was a negative defense and not an affirmative defense that Lafayette needed to specially plead. For example, in Keller v. Antedeo, 512 So.2d 385 (La.1987), the Supreme Court granted certiorari to determine whether, in an underinsured motorist case, the existence of additional liability insurance coverage covering the alleged underinsured motorist constituted an affirmative defense, which the UM carrier was required to set forth in its answer. In ruling that it did not, the Court distinguished between a "negative defense" and an "affirmative defense," stating that the latter raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the action and has the effect of defeating a plaintiff's *68 demand on the merits. The Court further noted that, because the claimant must plead and prove lack of insurance in order to recover in a UM case, the UM carrier's attempt to disprove this fact neither raised a new matter (a matter not raised by the plaintiffs petition) nor constituted a defense that assumes the plaintiff's allegations to be true; rather, it was a negative defense, which sought to disprove an essential element of the claimant's theory of the case. See also Alexander v. Cornett, 42,147, p. 9 (La.App. 2 Cir. 7/11/07), 961 So.2d 622, 628.
By comparison, in the instant case, Mr. Sher pled in his petition, among other things, that he sustained damages to his business personal property, which damages he claimed were covered by the policy issued to him by Lafayette. In its answer, Lafayette acknowledged the existence of such a policy, and further pled the policy, in its entirety, as a defense and/or limit to Mr. Sher's ability to recover business personal property losses under the policy. Because Mr. Sher is charged with the burden of establishing every essential fact and to establish that his claim is within the policy's coverage (see Mercadel v. Tran, 92-0798 (La.App. 4 Cir. 3/29/94), 635 So.2d 438, 440), including his right to recover business personal property losses, Lafayette's attempt to disprove business personal property coverage by asserting the terms and conditions of the policy did not raise a new matter or constitute a defense that assumes Mr. Sher's allegations to be true, but merely sought to disprove Mr. Sher's allegations that the Lafayette policy covers his alleged business personal property losses. Therefore, Lafayette's defense that the policy it issued to Mr. Sher does not cover business personal property losses was not an affirmative defense Lafayette needed to specially plead; it was a negative defense that merely sought to disprove an essential element of Mr. Sher's theory of his case, i.e., coverage for loss to his business personal property.
Nonetheless, whether determined to be a "negative defense" or "affirmative defense," the outcome remains the same. As I read the applicable policy provisions (quoted by the majority), because Lafayette's all-risk policy did not specifically exclude coverage for business personal property losses, I find that coverage was afforded under the policy as written.
Overhead and Profit
Lafayette complains that an award of 45% for overhead and profit is excessive. Actually, the 45% consists of 25% for overhead and profit and an additional 20% for contingencies. I agree with the majority that based upon the facts of this case, 25% for overhead and profit was not (is not) excessive in the post-Hurricane Katrina period when finding competent contractors has been/was difficult. Moreover, assigning 20% for contingencies and embracing expert testimony on that fact is not unreasonable and is within the trier of fact's discretion. The costs of material and labor in the post-Hurricane Katrina environment is not certain and can rise and fall with the scarcity or surplusage of either or both; unknown damage (hidden from an inspector's view) and discovered once repairs commence can be included in projected expenses of repairs. I do not find that the majority is incorrect in assessing such amounts against the plaintiff.
Water Hammer
From the record on appeal, I cannot say that water hammer effects were or were not present and that a trier of fact, myself included, could award such damages in this case. Lafayette need not have pleaded same as an affirmative defense, instead relying upon the language of their policy of insurance.
*69 Structural Damage
From the jurisprudence, a trier of fact has the discretion to believe or not believe whether structural damage was proven as existing more likely than not. As noted by the concurring opinion in Grefer v. Alpha Technical, 02-1237, (La.App. 4 Cir. 3/31/05), 901 So.2d 1117, the Louisiana Supreme Court affirmed an award of dam ages for contamination of a water aquifer when no evidence was present in the record that the aquifer had been contaminated by the defendant's operations. See Corbello v. Iowa Production, 02-0826, (La.2/25/03), 850 So.2d 686. If such be the law, a trier of fact does not err in awarding such damages and I find that the damages should be awarded on this record on appeal.
In sum, I respectfully concur in the result.
CANNIZZARO, J., concurring in part and dissenting in part.
Flood Coverage
I respectfully dissent from the majority's failure to reverse the trial court judgment granting partial summary judgment in favor of the plaintiff, Mr. Sher, on the issue of flood damage coverage.
Specifically, I find no merit in the majority's conclusion that the term "flood" as utilized in the policy at hand is susceptible to different meanings thereby rendering the water damage exclusion inapplicable. The policy issued to the plaintiff by the defendant, Lafayette Insurance Company, provides in Paragraph B, Section (g)(1), relative to "Water Exclusions", that the defendant "will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event . . . [:] [f]lood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all driven by wind or not. [Emphasis added.]" Based upon my review, the term "flood", as well as the entirety of the exclusion, is clear and unambiguous. See, Stewart Interior Contractors, L.L.C. v. Metalpro Industries, L.L.C., 07-0251 (La.App. 4 Cir. 10/10/07), 969 So.2d 653 ("Courts are not at liberty to alter the terms of insurance, policies that are unambiguous."). See also, La. C.C. art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.") and La. C.C. art. 2049 ("The words of a contract must be given their generally prevailing meaning.").
The majority's analysis of the water damage exclusion is flawed in two respects. First, the majority errs in its conclusion that Section (g)(1) provides a restrictive list of the only events that constitute "floods". Next, the majority correctly notes that "flood" is not defined within the policy and, as such, must be given its generally prevailing meaning. However, rather than accepting the term in its traditional context and as clearly written, the majority rendered the exclusion ineffective on the basis there are "varying causes of floods."
The evidence clearly establishes Section (g)(1) was not intended in any way to be a definition of the word "flood". The plain wording of the provision states that the defendant, will not compensate the plaintiff for "any" flood loss or damage, regardless of causation. Had the insurer intended to limit the definition of the term "flood" to certain events, it would have provided a restrictive definition of the word in the "Definitions" section of the policy, not in an exclusion.[1] It is unclear why the majority *70 places emphasis on causation as the definitive criteria. Nonetheless, it is my steadfast conclusion that the origin of the flood, whether man-made or otherwise, is of no consequence due to the clarity and unambiguousness of the water damage exclusion. See, Wickramasekra v. Associated Intern. Ins. Co., 02-2474 (La.App. 4 Cir. 6/25/03), 890 So.2d 569, 573 ("[C]ourts have no authority to alter the terms of policies under the guise of contractual interpretation when the policy provisions are couched in unambiguous language.").
The evidence adduced in support of the partial summary judgment does not establish beyond dispute the ambiguity of the water exclusion and, as such, that the plaintiff was entitled to flood coverage. Schroeder v. Bd. of Supervisors of La. State Univ., 591 So.2d 342, 345 (La.1991) ("Because the mover has the burden of establishing that no material factual issue exists, inferences to be drawn from the underlying materials before the court must be viewed in the light most favorable to the party opposing the motion [for summary judgment]. [Emphasis added]"). Consequently, the plaintiff failed to demonstrate that he was entitled to a judgment as a matter of law, and, as a result, the partial motion for summary judgment was erroneously granted.[2] Moreover, the lower court erred in awarding penalties to the plaintiff based on its improper determination that the defendant was arbitrary, capricious and without probable cause when it disputed the plaintiff's flood claim. Pleading of Affirmative Defenses and Business Personal Property Coverage
The defendant complains the trial court erred in precluding it from presenting defenses, with the exception of the water exclusion and payments made under the NFIP policy, on the basis that the exclusions were not specifically pled as affirmative defenses. The defendant only addressed in brief the trial court's failure to allow it to defend coverage claims for wind driven rain that entered through the plaintiff's windows and damages associated with the "water hammer" effect.[3]
It is undisputed that reliance upon an exclusion in an insurance contract is considered to be an affirmative defense, which must be set forth in an answer to a petition since it raises a new matter constituting a defense to an action. La. C.C.P. art. 1005; Tudury v. Cooperative Cab Co., 265 So.2d 307 (La.App. 4th Cir.1972). I agree with the majority's general proposition that, as to those defenses that constituted new matters not raised in the plaintiffs petition, the defendant's answer containing broad based denials and assertions did not establish an adequate pleading of affirmative defenses as mandated by La. C.C.P. art. 1005.[4]
*71 Applying this principle of law, I conclude the trial court mistakenly barred the defendant from contesting the claims relative to the wind driven rain and "water hammer" effect. The defendant sought to exclude these claims pursuant to Paragraph B, Section (g)(1), pertinent to "Water Exclusions", which is the same provision the trial court permitted the defendant to rely on to exclude flood coverage. Logically, the defendant did not have to plead an affirmative defense to the wind driven rain and "water hammer" effect claims since the water exclusion in the policy was already properly raised by the defendant and, as such, did not constitute a new matter not addressed in the petition,
For a different reason, I find the majority erred in its application of the rule relative to the pleading of affirmative defenses to the defendant's objection to the business personal property loss coverage. The plaintiff alleged the defendant issued a policy of insurance which entitles him to business personal property loss coverage for sustained damages. Specifically, he urged there was no evidence he rejected the property loss coverage. As a result, the plaintiff had the burden of establishing the facts that support his claim for policy coverage. While the defendant acknowledged the existence of the policy as a whole, it disputed the policy encompassed the coverage, not based on an exclusion, but rather as to the policy upon receipt from the underwriter. To disprove the claim, the defendant had to rely on the same policy terms, conditions, and declarations page the plaintiff relied on to seek recovery. By denying the plaintiff was not insured for property loss coverage, the defendant did not raise any new issues not encompassed by the petition that would implicate the applicability of La. C.C.P. art. 1005. See, Wimberly v. McCoy Tree Surgery Co., 33,761 (La.App. 2 Cir. 8/25/00), 766 So.2d 729 (crucial factor for the court was the fact both parties referred to the same coverage as defined in the policy, and not any special exclusions that might apply).
Regardless of my opposition to the majority's finding regarding the pleading of the defense of business personal property coverage, I nevertheless conclude the outcome would be the same. A review of the record indicates that the policy does provide *72 coverage for business personal property losses. Therefore, I concur in the result.
Lost Rents
I agree with the majority that the plaintiff is entitled to post-Katrina valuation of lost rents. However, only insofar as it applies to Apartments A and C, which did not sustain flood damage. Based on my determination of the absence of flood coverage under the policy, the jury was manifestly erroneous in awarding loss rent for flood damage sustained to Apartment E. Nor do I find the defendant was arbitrary or capricious in disputing this claim, thereby rendering the imposition of penalties inappropriate.
Building Damages
I affirm the majority's finding of the lack of manifest error or abuse of discretion in the jury's assessment of damages for overhead and profit and structural damage, as well as affirm the imposition of penalties for the defendant's arbitrary and capricious conduct when disputing these claims. As to the "water hammer" effect claim, I can not say from the record what damages, if any, were awardable, in light of the trial court's erroneous failure to permit the defendant to present a defense. However, the defendant was not arbitrary or capricious in disputing these damages due to its inability to present a defense. Thus, the imposition of penalties relative to the "water hammer" effect was inappropriate.
Penalties, Attorney's Fees, Legal Interest and Costs
As stated, I disagree with the assessment of penalties against the defendant under La. R.S. 22:658 for alleged arbitrary and capricious conduct as to the issues of flood coverage, Apartment E lost rentals, and the "water hammer" effect. In all other respects, I affirm the award of penalties for the defendant's arbitrary and capricious conduct and, as to those limited instances, the majority's application of the pre-amended version of La. R.S. 22:658 imposing a twenty-five (25%) penalty.
Nor do I dispute the majority's reversal of the award of attorney's fees. It is well recognized in the jurisprudence that as a general rule attorney's fees are not allowed except where authorized by statute or contract. Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (La.1970).
On all other respects, I would affirm the judgment of the trial court. Finally, as to those issues wherein I affirmed the majority's award of damages, I also subscribe to the imposition of legal interest and costs.
NOTES
[1] Torn Miller, a United Fire and Casualty Company claims supervisor, testified that an "all-risk" insurance policy covers "all risks except those that are excluded or limited within the policy,"
[2] Mr. Sher communicated with Lafayette throughout the process via his son Leopold Sher.
[3] "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. C.C. art.1906.
[4] La. R.S. 29:762 Definitions reads, in pertinent part:

(12)(a)(iii) A disaster, including but not limited to natural disasters such as hurricane, tornado, storm, flood,. . . .
[5] The trial court denied the admittance of the requested jury charges and proffered Mr. Leopold Sher's testimony regarding Mr. Sher's alleged mental anguish.
[6] As determining what constitutes an affirmative defense is a question of fact, we do not find that the trial court committed manifest error by labeling Lafayette's other defenses as affirmative defenses.
[7] The "water hammer" effect results from a sudden increase in water pressure, which can burst water mains and pipes, etc.
[1] A conflict in the circuit courts of appeal exists on this point of law.
[1] Nor do I find the majority's reliance on La. R.S. § 29:723, relative to the Homeland Security and Emergency Assistance and Disaster 3. Act, to be applicable under the facts. While the provision provides examples of types of disasters, it provides no guidance to the use of the word "flood" relative to the case at hand and, particularly, to the policy issued by the 4. defendant (i.e., contract between the parties.).
[2] For argument sake, even if the meaning of flood was limited to "natural", and not "man made", events, the lower court erred in granting summary judgment because there were genuine issues of fact with respect to the cause of the water inundation of the plaintiff's property (i.e., causation of levee breakage).
[3] Notably, the majority does not specifically address the trial court's failure to permit the defendant from asserting a defense to the wind driven rain claim.
[4] There is sparse jurisprudence, and none of which can be considered controlling, on the issue of the sufficiency of general denials of coverage and assertions of exclusions via the pleading of an insurance policy in extenso in answers to petitions. At first glance, it may appear there is a conflict in the circuits on the issue of whether a pleading of an insurance policy in extenso meets the requirement of asserting an affirmative defense.

The majority correctly relies on Dixie Savings & Loan Ass'n v. Pitre, 99-154 (La.App. 5 Cir. 7/27/99), 751 So.2d 911, for the proposition that the pleading of a policy of insurance in extenso does not meet the affirmative defense mandate. In Dixie, the defendant asserted a broad based general defense in its answer without reference to any particular exclusion. Specifically, the defendant urged in his answer the "policy is its own best evidence and the provisions, exclusions, and limitations therein are pled herein as though copied in extenso." The court of appeal affirmed the trial court ruling precluding the defendant from asserting several defenses since they were not specifically raised as affirmative defenses in the defendant's answer.
It appears in the case of Brantley v. State Farm Ins. Co., 37-601 (La.App. 2 Cir. 1/28/04), 865 So.2d 265 that a result similar to Dixie was suggested. In Brantley, the defendant's answer to the petition provided "defendant asserts all defenses under the policy, including failure to cooperate, fraud, abandonment of the property and no inhabitants for 30 days before fire. [Emphasis added]," The plaintiffs sought appellate review of the denial of their motion to strike premised on the inadequacy of the defendant's answer for failure to assert the affirmative defenses of failure to cooperate and abandonment. Without citing reasons, the court found the answer was sufficient to deny the plaintiffs relief as to their motion to strike.
Thus, it may be logically concluded the qualifying language as to the specific defenses at issue that accompanied the general denial in Brantley was the pivotal factor for the sufficiency of the answer. Similar qualifying language was not present in the Dixie case and, thus, I conclude differentiates the two cases.